Steven Gregory JOHNSON, Appellant

v.

Erik CAMPBELL, Officer, in his official and personal capacity; the Township of Dewey Beach, a political subdivision of Sussex County, Delaware; Ocean Breeze Limited Liability Company dba The Sea Esta III Motel; Christine Price.

No. 02–3580.

United States Court of Appeals, Third Circuit.

Argued March 11, 2003.

Filed June 5, 2003.

Megan Mantzavinos, [Argued], Marks, O'Neill, O'Brien & Courtney, Wilmington, DE, for Appellees.

Before RENDELL, AMBRO and MAGILL,* Circuit Judges.

## OPINION OF THE COURT

RENDELL, Circuit Judge.

Steven Gregory Johnson, an African-American high school basketball coach, was stopped by the police on the basis of a "suspicious person" complaint and arrested for disorderly conduct after he swore at the investigating police officer. He was released without charge. Johnson then brought an action under 42 U.S.C. § 1983 against the arresting officer, Officer Erik Campbell, asserting that Campbell had violated his constitutional rights by detaining and arresting him without cause and due to his race. Johnson was denied relief by a jury verdict after trial. Johnson now seeks reversal of the District Court's denial of his motion for judgment as a matter of law and for a new trial. Because we conclude that the evidence was insufficient to establish that the stop was based on a reasonable, articulable suspicion that Johnson was engaged in criminal activity, or that the arrest was based on probable cause to believe that Johnson was committing the crime of disorderly conduct, we will reverse and grant Johnson judgment as a matter of law.

## I.

This case comes to us after a jury verdict finding no liability on the part of Officer Campbell for the violation of John-

Victor F. Battaglia, [Argued], Biggs & Battaglia, Wilmington, DE, for Appellant.

* The Honorable Frank J. Magill, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

son's rights. We are mindful of the deference that we owe such verdicts, *see Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1095 (3d Cir.1995), and therefore present the facts established at trial in the light most favorable to Campbell.

Steven Johnson was a forty-four year old African–American who coaches basketball for William Penn High School in New Castle, Delaware. In December 1999, Johnson's team participated in the Slam Dunk to the Beach Tournament in Rehoboth Beach, Delaware. During the tournament, Johnson, his assistant coach Donald Abblitt, and the team stayed at the Sea Esta III Motel (the "Motel") in Dewey Beach.

The team checked into the Motel on December 27 and played their first game the next day. Following the game, the team returned to the Wilmington area to be with their families over the holidays. The team returned to the Motel after dark on December 29. During the drive back, Abblitt and Johnson had a disagreement regarding one of the students. When they arrived at the Motel, Johnson went across the street to get a cup of coffee, leaving Abblitt to settle the students into their rooms.

When Johnson returned to the Motel, he stopped in the office for a few minutes. The Motel office was very small, the principal feature of which was the front counter. In one corner was an area with coffee and free newspapers. Christine Price, who had previously been a fourteen-year veteran of the police force, was the clerk on duty at the time. She said hello to Johnson, who mumbled back that he was staying there. She asked him if it was cold out, and he replied that it was, and that he had just been across the street at the gas station. Johnson spoke in a very clipped manner but politely answered the questions Price put to him. After they spoke, Johnson walked over to the newspapers and started flipping through them. A few minutes later, he started acting agitated, pacing back and forth, looking out the window, rubbing his head, and glancing up at the television. His actions made Price nervous, partly because she had been robbed five months earlier by two young black males, one of whom had previously been a guest at the Motel.

After finishing his coffee, Johnson took the newspaper and left the office. Price could not see where he went but believed he had gone out to the parking lot. She had been on the phone to her husband, and as soon as Johnson was gone, she told him that she was upset and scared, and asked him to call the Dewey Beach Police Department to come check on her welfare. Her husband called the police, explaining that his wife was upset and he wanted them to check it out because she had previously been the victim of a robbery.

Sergeant George Berry then went to the Motel office and spoke to Price about the complaint. He was joined shortly thereafter by Officer Erik Campbell. Berry knew that Price had been trained as a police officer. In fact, Berry had worked with her a number of times when she was a state trooper, so he trusted her judgment. Price told him that a black male, approximately 5′9″, wearing a brown jacket, who had said he was a guest at the Motel, had entered the lobby, picked up a paper, and left. She explained that the man's actions, "the way he was walking and pacing around the office and his body language" had made her nervous and scared her.

Campbell overheard part of the conversation between Berry and Price but did not himself ask any questions of Price, as he was distracted by a basketball player who had come into the office. After Price gave a description of Johnson, Berry di-

rected Campbell to search for a man matching that description. Campbell left the lobby and began looking around the Motel and parking lot. He saw Johnson reading a paper in the driver's seat of a green van with Abblitt beside him. Campbell approached the van from the front so he did not notice that it was marked "Colonial School District" nor that it bore a "State Owned" license tag. Although he did not think that Johnson had committed any crime, he did believe that Johnson matched the description of the man who had made Price nervous. Campbell approached the van and gestured to Johnson to roll down his window. He then told Johnson that he "was being detained."

Johnson stared back at Campbell and did not at first comply with Campbell's request to roll down his window. After Campbell asked a few more times, Johnson rolled his window down a few inches. Campbell then asked Johnson for identification, which Johnson refused to provide, asking what the problem was and why he was being asked for identification. Campbell responded that Johnson was required by Delaware law to provide identification and that as soon as Johnson gave his identification, he could be on his way. Johnson continued giving Campbell a "hard time," questioning Campbell about his motives for interrogating him, saying he had done nothing wrong. Campbell explained that he was investigating a "suspicious person" complaint and told Johnson that he matched the description. Johnson did not accept this explanation or hand over his ID; he continued to ask why he had to provide identification. Campbell tried to contact Berry by radio, thinking that Berry would be able to give him more information on what Price had said.

Campbell was unable to get through to Berry but remained on the radio, speaking to his dispatcher.

Around this time, Abblitt exited the passenger side of the van and approached Campbell, asking what the problem was. Members of the team also came out of their rooms and watched the events unfold in the parking lot.

When Campbell got off the radio, he heard Johnson mutter "son of a bitch." Campbell then turned to Abblitt, said, "I know you heard it," and placed Johnson under arrest for disorderly conduct, for his use of profane language in public. Johnson was taken to the police station and detained for less than an hour. He was released without being charged.

Johnson then filed an action under section 1983 in the United States District Court for the District of Delaware against Campbell and his employer, the Township of Dewey Beach, alleging that the stop and arrest had violated his Fourth Amendment right to be free from unreasonable seizures and his Fourteenth Amendment right to equal protection.[1] Johnson's claims went to trial before a jury.[2] At trial, Johnson submitted proposed jury instructions on the federal standard for reasonable, articulable suspicion that would justify a stop, and on the limitation imposed on the Delaware disorderly conduct statute, restricting that conduct, if based on words, to "fighting words." The District Court refused to give those instructions. Instead, the Court instructed the jury on Delaware law allowing the police to stop anyone whom the officer had reasonable ground to suspect was about to commit a crime. *See* Del.Code Ann. tit. 11, § 1902 (2000). Regarding the disorderly

---

**1.** Johnson also brought claims against the Motel and Price, which were settled prior to the end of trial.

**2.** Neither Campbell nor the Township pled the defense of qualified immunity.

conduct statute, the Court described the statutory offense exactly as written, without making any distinction between protected and unprotected speech. *See* Del. Code Ann. tit. 11, § 1301 (2000).

At the close of evidence, Johnson moved under Federal Rule of Civil Procedure 50 for judgment as a matter of law, which was denied. The jury returned a verdict in favor of Campbell and the Township. The jury specifically found that neither Johnson's detention nor his arrest was due to racial discrimination or in violation of his constitutional right not to be deprived of liberty without due process of law.[3] After trial, Johnson renewed his motion for judgment as a matter of law and moved in the alternative for a new trial. He argued that there was insufficient evidence to support the jury's findings that Campbell had reasonable suspicion to stop him and probable cause to arrest him, and that the jury instructions on reasonable suspicion and disorderly conduct were incorrect and prejudicial. The Court denied both motions.

## II.

Johnson appeals, asking us to enter judgment as a matter of law in his favor or to grant a new trial.[4] We exercise plenary review over the District Court's denial of judgment as a matter of law. *Goodman v. Pennsylvania Turnpike Comm'n*, 293 F.3d 655, 664–65 (3d Cir.2002). In so doing, we apply the same standard as the District Court, that is, whether, viewing the evidence in the light most favorable to the verdict, a reasonable jury could have found for the prevailing party. *Starceski*, 54 F.3d at 1095. A scintilla of evidence is not enough for the verdict winner to survive a Rule 50 motion. *Goodman*, 293 F.3d at 665. Although judgment as a matter of law should be granted sparingly, we will grant it where "the record is critically deficient of the minimum quantum of evidence" in support of the verdict. *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083 (3d Cir.1995). "The question is not whether there is literally *no evidence* supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly have found its verdict." *Id.* (emphasis added); *see also Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114 (3d Cir.1987) (vacating jury verdict and granting judgment as a matter of law for defendant because plaintiff did not present sufficient evidence of causation to allow negligence claim to go to jury).

For the reasons discussed below, we find the record here critically lacking in evidentiary support for the jury's findings that Officer Campbell had a reasonable, articulable suspicion that Johnson was engaged in criminal activity when he stopped him, and that Campbell had probable cause to arrest Johnson for disorderly conduct when Johnson swore.[5] Campbell stopped

---

3. We read, and the parties appear to treat, the jury's findings that Johnson's detention and arrest were not in violation of his constitutional right "not to be deprived of liberty without due process of law" to be findings that the detention and arrest did not violate the Fourth Amendment.

4. The District Court had jurisdiction over Johnson's section 1983 claims pursuant to 28 U.S.C. § 1331. Our jurisdiction over the District Court's final orders is based on 28 U.S.C. § 1291.

5. Although we find the record insufficient to support the jury's verdict on Officer Campbell's liability, we will affirm the District Court's denial of judgment as a matter of law as against the Township. We agree with the District Court that there was sufficient evidence for a reasonable jury to conclude that the Township's police training did not amount to "deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Johnson on nothing more than Christine Price's nervous reaction to Campbell's fidgety behavior in the office. He then arrested Johnson for doing nothing more than speaking unpleasant words. Although we are cognizant of the important role that the police play in keeping our citizens safe, and we do not lightly second guess the decisions made by police officers in the field, in this instance Campbell went too far; he stepped over the line that separates zealous police work from an unsupportable intrusion on a person's liberty.

## A. Reasonable Suspicion for the Stop

We begin with the stop. The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. What is constitutionally "unreasonable" varies with the circumstances, and requires a balancing of the "nature and extent of the governmental interests" that justify the seizure against the "nature and quality of the intrusion on individual rights" that the seizure imposes. *Terry v. Ohio*, 392 U.S. 1, 22, 24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry*, the Supreme Court held that brief investigative stops were "seizures" subject to Fourth Amendment protection, and that a police officer may conduct such a stop only if the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. 1868. In judging the reasonableness of stops, we must ask if "the facts available to the officer at the moment of the seizure ... 'warrant a man of reasonable caution in the belief'" that "criminal activity may be afoot." *Id.* at 21–22, 30, 88 S.Ct. 1868 (citations omitted). Thus, under *Terry*, in evaluating whether Campbell's interaction with Johnson prior to his arrest amounted to an unreasonable seizure, we must first determine at what moment Johnson was seized, and then whether that seizure was justified by reasonable, articulable facts known to Campbell as of that time that indicated that Johnson was engaged in criminal activity.

■ A person is seized for *Terry* purposes when, "taking into account all of the circumstances surrounding the encounter, the police conduct would ... 'communicate[ ] to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Kaupp v. Texas*, —— U.S. ——, 123 S.Ct. 1843, 1845, 155 L.Ed.2d 814 (2003) (quoting *Florida v. Bostick*, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). A seizure does not occur every time a police officer approaches someone to ask a few questions. Such consensual encounters are important tools of law enforcement and need not be based on any suspicion of wrongdoing. *Bostick*, 501 U.S. at 434, 111 S.Ct. 2382. However, when the interaction ceases to be consensual, that is, when a reasonable person would no longer "feel free to decline the officers' requests or otherwise terminate the encounter," the Fourth Amendment requires the officer to be able to point to specific facts justifying the intrusion. *Id.* at 436, 111 S.Ct. 2382; *see also United States v. Drayton*, 536 U.S. 194, 122 S.Ct. 2105, 2112, 153 L.Ed.2d 242 (2002) (finding no seizure where police officers gave defendants "no reason to believe that they were required to answer the officers' questions"); *United States v. Kim*, 27 F.3d 947, 951 (3d Cir.1994) (stating that our task in assessing a police encounter is "to decide whether, under the totality of the circumstances ... a reasonable person would [feel] free to decline [an officer's] requests or otherwise terminate the encounter with him").

■ The parties disagree about the exact moment when the interaction between Johnson and Campbell became a stop.

Johnson argues that, based on Campbell's testimony that he detained Johnson "at the beginning of [his] dealing with him," the stop began before Johnson even had a chance to protest.[6] Campbell disagrees, arguing that the stop began at some point after Johnson had repeatedly refused to cooperate, and was therefore justified in part by Johnson's hostile behavior.

In light of our standard of review, we read Campbell's statement that he detained Johnson "at the beginning" broadly, and believe that the answer lies somewhere in-between the positions taken by the parties, at the moment, perhaps a few seconds into the encounter, when it became clear that Johnson could not refuse Campbell's requests. Although Johnson may have felt free to decline, and did in fact attempt to decline, Campbell's initial request to roll down the window, the very next moment, when Campbell persisted rather than accepting Johnson's choice not to acquiesce, the interaction became a stop. At that time, Campbell made it clear that Johnson was not free to ignore him and would not be left alone until he complied.

■ We must now determine whether the facts known to Campbell as of that moment were enough to render the stop constitutionally sound. We review Campbell's reasonable suspicion determination *de novo*. *Ornelas v. United States*, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Under *Terry*, Johnson's detention must have been based on something more substantial than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry*, 392 U.S. at 27, 88 S.Ct. 1868. Campbell must be able to point to "some objective manifestation that [Johnson

was], or [was] about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). The test is one of reasonableness given the totality of the circumstances, which can include Johnson's location, a history of crime in the area, Johnson's nervous behavior and evasiveness, and Campbell's "commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 124–25, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); *see also United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (reiterating that officers must be allowed to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them"). The ultimate question is whether a reasonable, trained officer standing in Campbell's shoes could articulate specific reasons justifying Johnson's detention.

■ Although we ask for objective specificity, we do not demand scientific certainty. Campbell need not have observed criminal activity first hand to form a reasonable suspicion of wrongdoing. Rather, officers may rely on a trustworthy second hand report, if that report includes facts that give rise to particularized suspicion. *See Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (rejecting the argument "that reasonable cause for a stop and frisk can only be based on the officer's personal observation, rather than on information supplied by another person"). Thus, Campbell may rely on Price's description of Johnson's behavior in the office if her account gives

---

**6.** During direct examination, Campbell was asked, "Officer, did you tell Mr. Johnson that he was being detained at the beginning of your dealing with him?" Campbell respond-

ed, "Yes, sir, I did." Johnson's counsel continued, "So it was clear that he was not free to go?" To which Campbell answered, "Yes, sir."

rise to reasonable suspicion that Johnson was about to commit a crime.

■ Furthermore, "[a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." *United States v. Ubiles,* 224 F.3d 213, 217 (3d Cir.2000). The Supreme Court has upheld a number of stops based on an officer's observation of entirely legal acts, where the acts, when viewed through the lens of a police officer's experience and combined with other circumstances, led to an articulable belief that a crime was about to be committed. One of the best examples is *Terry* itself. There, the Supreme Court upheld a stop based on an officer's belief that Terry and his cohorts were "casing" a store. *Terry,* 392 U.S. at 6, 88 S.Ct. 1868. In so doing, the Court articulated how seemingly innocent actions can lead to a reasonable belief that criminal activity is afoot, and provided the prototypical example of particularized suspicion. The Court stated:

> There is nothing unusual in two men standing together on a street corner, perhaps waiting for someone. Nor is there anything suspicious about people in such circumstances strolling up and down the street, singly or in pairs. Store windows, moreover, are made to be looked in. But the story is quite different where, as here, two men hover about a street corner for an extended period of time, at the end of which it becomes apparent that they are not waiting for anyone or anything; where these men pace alternately along an identical route, pausing to stare in the same store window roughly 24 times; where each completion of this route is followed immediately by a conference between the two men on the corner; where they are joined in one of these conferences by a third man who leaves swiftly; and where the two men finally follow the third and rejoin him a couple of blocks away.

*Id.* at 22–23, 88 S.Ct. 1868. The Court concluded that these "specific, reasonable inferences" of criminal activity furnished more than a mere inchoate hunch and therefore justified the stop. *Id.* at 27, 88 S.Ct. 1868.

Similarly, in *Wardlow,* the Court held that officers acted reasonable in stopping a man whose acts, when viewed in isolation, were entirely legal, but when taken in combination with other circumstances gave rise to a reasonable suspicion of criminal activity. *Wardlow,* 528 U.S. at 125, 120 S.Ct. 673. There, police officers were patrolling an area known for heavy narcotics trafficking. They stopped a man who was carrying an opaque bag and had fled immediately upon seeing them. *Id.* at 121–22, 120 S.Ct. 673. The Court held that the stop did not violate the Fourth Amendment. It explained that, although "an individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," when combined with the individual's unprovoked flight, the circumstances were enough to give rise to a reasonable suspicion of wrongdoing. *Id.* at 124, 120 S.Ct. 673; *see also Arvizu,* 534 U.S. at 268, 122 S.Ct. 744 (holding that it was reasonable for a border patrol agent to infer that the defendant was attempting to avoid a smuggling checkpoint because, among other factors, the defendant's minivan turned away from the known recreation areas and the children in the back seat were waving oddly as if they were being instructed); *United States v. Sokolow,* 490 U.S. 1, 3, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (finding stop to be reasonable where a man had paid for two expensive airline tickets with a roll of $20 bills, was traveling under a name that did

not match the name listed for his telephone number, returned to Hawaii from Miami within 48 hours of departing, appeared nervous during the trip, and did not check any luggage); *United States v. Valentine*, 232 F.3d 350, 357 (3d Cir.2000) (concluding that "officers had reasonable suspicion after they received [a] face-to-face tip, were in a high crime area at 1:00 a.m., and saw [the defendant] and his two companions walk away as soon as they noticed the police car").

■ There are limits, however, to how far police training and experience can go towards finding latent criminality in innocent acts. Although the Supreme Court has often deferred to police expertise in identifying potentially criminal circumstances, it has held that a police officer may not stop someone simply because he "looked suspicious." *Brown*, 443 U.S. at 49, 99 S.Ct. 2637. In *Brown*, two police officers were cruising in a patrol car and observed Brown and another man walk away from each other in an alley. *Id.* at 48, 99 S.Ct. 2637. One of the officers thought the situation "looked suspicious" because he had never seen Brown in that area before and the area was known to have a high incidence of drug traffic. The officer got out of the car and asked Brown to identify himself and explain what he was doing there. *Id.* at 49, 99 S.Ct. 2637. When Brown refused to do so and angrily asserted that the officers had no right to stop him, he was arrested for violating a Texas statute that made it illegal for someone to refuse to give his name to an officer who had lawfully stopped him. *Id.*

The Supreme Court reversed Brown's conviction under the Texas statute, holding that his seizure violated the Fourth Amendment. The Court explained that the officer had been unable to point to any facts supporting his conclusion that the situation in the alley was suspicious, and

that Brown's presence "in a neighborhood frequented by drug users, standing alone, [was] not a basis for concluding that [Brown] himself was engaged in criminal conduct." *Id.* at 52, 99 S.Ct. 2637; *see also United States v. Brignoni–Ponce*, 422 U.S. 873, 885, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (holding that although a trained border patrol officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling, the officer cannot rely solely on a driver's apparent Mexican ancestry to stop a car and check for illegal aliens).

■ Furthermore, the Supreme Court has "consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Bostick*, 501 U.S. at 437, 111 S.Ct. 2382. In *Wardlow*, the Supreme Court carefully distinguished unprovoked flight in a high crime area, which could lead to a reasonable suspicion of criminal activity, from mere nervousness or evasiveness. The Court reiterated that an individual "has a right to ignore the police and go about his business" without that activity being deemed inherently suspicious. *Wardlow*, 528 U.S. at 125, 120 S.Ct. 673 (citing *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)).

■ Finally, we have recently reiterated that the activity of which the detainee is suspected must actually be *criminal*. *Ubiles*, 224 F.3d at 218. In *Ubiles*, the defendant was stopped and searched at a street carnival in the Virgin Islands based solely on an anonymous tip that he had a gun in his possession. *Id.* at 215. At trial, the District Court refused to suppress the evidence gathered from the search, and Ubiles was convicted for possessing an unregistered firearm. *Id.* We reversed and vacated the conviction, holding that the stop and search were unlawful because

they were not based on a reasonable suspicion of criminal activity. *Id.* at 214, 217. First, we noted that it was not necessarily a crime to possess a gun in the Virgin Islands, and that a mere allegation that a suspect possesses a gun, without more, does not justify a stop. *Id.* at 217 (citing to *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000)). We then looked at the officer's testimony from the suppression hearing and found no evidence to suggest that the officers were "aware of any articulable facts suggesting that the gun Ubiles possessed was defaced or unlicensed, that Ubiles posed a safety risk to the authorities or the [carnival] celebrants, or that Ubiles was acting in a manner indicating that he was involved in a different crime." *Id.* at 218. "For all the officers knew," we continued, "Ubiles was another celebrant lawfully exercising his right under Virgin Islands law to possess a gun in public. That is as much as [the tipster] told [the officers] in pointing to Ubiles and informing them that Ubiles had a gun in his possession." *Id.* As the officers lacked any reason to believe that Ubiles's conduct was *criminal*, the stop infringed on his Fourth Amendment rights. *Id.*

■ Campbell argues that the stop here was justified by Price's account of Johnson's nervous, agitated behavior, lack of apparent purpose for being in the office, pacing, head rubbing, and clipped answers to her questions. Campbell emphasizes that Price was a trained officer and that Berry and Campbell gave her recitation of the events "a lot of credibility." He also argues that two men sitting in a motel parking lot for no apparent reason on a cold night in December is inherently suspicious, and that Johnson's initial hostile response to his request to roll down the window added to his suspicion.[7] Johnson counters that Price and Campbell's inchoate feelings that Johnson was acting "suspiciously" are nothing more than unparticularized hunches and are an insufficient basis for his detention.

We agree with Johnson that the facts available to Campbell as of the moment he stopped Johnson simply did not give rise to a reasonable, articulable suspicion that he was engaged in criminal activity. We do not doubt Price's credibility, nor her training and experience. We also do not doubt that the previous robbery may have been in her mind and that she was frightened when she asked her husband to call the police. But no amount of training, experience, or subjective nervousness can turn the simple, objective facts that Johnson was drinking coffee, flipping through a newspaper, pacing, and rubbing his head into articulable suspicion that Johnson was about to commit *a crime*. Furthermore, by the time that Campbell reached him, Johnson was doing nothing more than sitting in a van with another man and read-

---

7. Campbell further argues in his brief that he was entitled to qualified immunity because he complied with title 11, section 1902 of the Delaware Code, which allows an officer to stop any person whom he has reasonable ground to suspect is committing, has committed, or is about to commit a crime, and to detain anyone who refuses to provide identification. There are two problems with this argument: first, as was clarified at oral argument, Campbell did not raise the defense of qualified immunity in his pleadings; he may not raise it for the first time on appeal. Sec-

ond, even assuming that Campbell properly followed Delaware state law, he may not escape liability for the violation of a federal constitutional right unless he also complied with federal requirements. *See Good News Club v. Milford Cent. School*, 533 U.S. 98, 107 n. 2, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) (noting that state law allowing for exclusion of religious clubs in public schools was no defense to claim that the exclusion constituted viewpoint discrimination under the First Amendment).

ing a paper – activities that, even when done on a cold night in December, do not add any cause for particularized suspicion, and that a citizen must be allowed to do unhindered by the police.

This is not like *Terry*, Wardlow, or the other cases in which the officers were able to articulate a chain of inferences that led logically to their belief that criminal activity was afoot. Unlike in *Terry*, Campbell has been unable to articulate why exactly Johnson's behavior was suspicious. No one has suggested that Johnson was "casing" the office, or that anything he did there was criminal. Campbell has not enunciated a logical series of inferences that would lead a reasonable person to believe that Johnson was about to undertake a specific crime. Also, unlike in *Wardlow*, where the defendant's flight was a relevant consideration, the only evasive action Johnson took was his initial refusal to roll down his window. As the *Wardlow* Court explained, this kind of refusal to comply is different from full-blown flight and was perfectly within Johnson's rights; it cannot provide cause for a reasonable suspicion of wrongdoing. *See Wardlow*, 528 U.S. at 125, 120 S.Ct. 673. As for Johnson's later uncooperative behavior, that cannot be held against him because it occurred *after* the stop had already begun.

The fact remains that Campbell stopped Johnson simply because he looked like he might be the man who had made Christine Price nervous. He did so without first ascertaining any facts that would lead to reasonable suspicion and without investigating whether Johnson was a guest or

even briefly glancing at the license plate or the signage on the van. As in *Brown*, Campbell was acting on no more than a feeling that Johnson was "suspicious." As in *Ubiles*, Campbell has been unable to identify any facts suggesting that Johnson was about to rob Price or commit any other criminal act. For all he knew, Campbell was simply a jittery man reading a newspaper, an act that involves no illegality.

Again, in coming to our decision that no reasonable jury could find that Campbell had a reasonable, articulable suspicion that Johnson was engaged in wrongdoing, we do not ignore Price's subjective feeling of nervousness or her testimony that she was scared and upset after Johnson left. However, one citizen's subjective feelings are not enough to justify the seizure of another where the objective facts do not point to any articulable basis for suspicion. The availability of objective facts justifying a seizure is of paramount importance. As the Supreme Court has emphasized, the "demand for specificity in the information upon which police action is predicated is the central teaching of ... Fourth Amendment jurisprudence." *Cortez*, 449 U.S. at 418, 101 S.Ct. 690. For, when a stop is not based on specific, objective criteria, "the risk of arbitrary and abusive police practices exceeds tolerable limits." *Brown*, 443 U.S. at 52, 99 S.Ct. 2637. Here, because the stop was based on nothing more than an "inchoate and unparticularized suspicion or 'hunch,' " *Terry*, 392 U.S. at 27, 88 S.Ct. 1868, it violated Johnson's Fourth Amendment right to be free from unreasonable seizures.[8] We will therefore

---

**8.** In addition to finding that the stop did not violate Johnson's right to due process, the jury also found that it was not "due to racial discrimination." On appeal, Johnson does not address this aspect of the jury's finding, except to urge, during oral argument, that we remand for a new trial because the jury was never given the opportunity to truly decide the issue. As this aspect was not briefed, and we find the record supportive of the jury's finding that the stop was not due to racial discrimination, we will affirm the District Court's denial of judgment as a matter of law

reverse the District Court's denial of judgment as a matter of law.

## B.  Probable Cause for the Arrest

We next address whether Johnson's arrest for disorderly conduct also violated his Fourth Amendment rights. The arrest was sound only if it was based on probable cause. *Michigan v. DeFillippo,* 443 U.S. 31, 36, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979); *Estate of Smith v. Marasco,* 318 F.3d 497, 514 (3d Cir.2003). Probable cause "means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *DeFillippo,* 443 U.S. at 37, 99 S.Ct. 2627. The validity of the arrest is not dependent on whether the suspect actually committed any crime, and "the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant." *Id.* at 36, 99 S.Ct. 2627. What matters is whether, looking at the totality of the circumstances at the time of the arrest, "the objective facts available to the officers ... were sufficient to justify a reasonable belief that an offense was being committed." *United States v. Glasser,* 750 F.2d 1197, 1206 (3d Cir.1984) (citing *Beck v. Ohio,* 379 U.S. 89, 96, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)). Here, we must determine whether, looking at the totality of the circumstances at the time of Johnson's arrest, Campbell had probable cause to believe that Johnson was committing the offense of disorderly conduct.

We must first understand what the crime of disorderly conduct entails. The Delaware Code provides:

> A person is guilty of disorderly conduct when: (1) The person intentionally causes public inconvenience, annoyance or alarm to any other person, or creates a risk thereof by: a. Engaging in fighting or in violent, tumultuous or threatening behavior; or b. Making an unreasonable noise or an offensively coarse utterance, gesture or display, or addressing abusive language to any person present.

Del.Code Ann. tit. 11, § 1301. The language of section 1301 alone, however, is not sufficiently comprehensive in certain situations. When the regulated conduct consists of speech, the statute must "be carefully drawn or authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression." *Gooding v. Wilson,* 405 U.S. 518, 522, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). To bring section 1301 within constitutional limits, the Superior Court of Delaware has authoritatively construed it to prohibit only "fighting words – those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *State v. White,* 1989 WL 25818, at *1 (Del.Super. March 7, 1989) (quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)).[9] Such an authoritative construction of the statute by a state court "is as binding [on a federal court] as though the precise words had been written

and a new trial regarding racial discrimination.

**9.** We have found nothing in the Delaware Court Rules to lead us to conclude that an unreported decision of the Superior Court of Delaware is not authoritative in this context, nor have the parties so argued. On the contrary, the Court Rules allow for the citation of unreported decisions. *See* Del. Sup.Ct. Rules, Rule 14(b)(vi)(4) (West 2003) (describing how unreported opinions should be attached to briefs); *Id.,* Rule 93(d)(ii) (describing how unreported opinions should be cited).

into the [statute]." *Terminiello v. City of Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). Therefore, when we read section 1301, we must also read into it a restriction to punish only such speech that consists of "fighting words," as those words are understood in First Amendment jurisprudence.

The unprotected category of speech called "fighting words" is an extremely narrow one. The First Amendment on the whole offers broad protection for speech, be it unpleasant, disputatious, or downright offensive. As the Supreme Court has explained, "a principal 'function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.'" *Texas v. Johnson,* 491 U.S. 397, 408, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (quoting *Terminiello,* 337 U.S. at 4, 69 S.Ct. 894). This is why "freedom of speech, though not absolute, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Terminiello,* 337 U.S. at 4, 69 S.Ct. 894. To be punishable, words must do more than bother the listener; they must be nothing less than "an invitation to exchange fisticuffs." *Johnson,* 491 U.S. at 409, 109 S.Ct. 2533.

This is equally true when the words are spoken in the presence of police officers. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill,* 482 U.S. 451, 462–63, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (holding that ordinance making it unlawful to interrupt a policeman in the execution of his duty was overbroad). Indeed, the Supreme Court has suggested that the "fighting words" exception "might require a narrower application in cases involving words addressed to a police officer, because 'a properly trained officer may reasonably be expected to exercise a higher degree of restraint' than the average citizen, and thus be less likely to respond belligerently to 'fighting words.'" *Id.* at 462, 107 S.Ct. 2502 (quoting *Lewis v. City of New Orleans,* 415 U.S. 130, 135, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974) (Powell, J., concurring)).

On the specific subject of "profane" words, the Supreme Court has held that even those words alone, unaccompanied by any evidence of violent arousal, are not "fighting words," and are therefore protected speech. *Cohen v. California,* 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). In *Cohen,* the Supreme Court reversed a conviction for disturbance of the peace where the defendant had worn a jacket bearing the words "F–k the Draft" inside a courthouse. *Id.* at 16, 91 S.Ct. 1780. The Court held that it was not enough that the jacket might cause others to "rise up to commit a violent act against the person of the defendant or attempt to forcibly remove his jacket." *Id.* at 17, 91 S.Ct. 1780. Because the defendant did not threaten anyone or provoke others to acts of violence, he could not be punished. The Court emphasized that even offensive and distasteful words must be protected, for "one man's vulgarity is another's lyric," and courts cannot make principled distinctions on matters of taste and style. *Id.* at 25, 91 S.Ct. 1780. It is the function of words to convey "not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well." *Id.* at 26, 91 S.Ct. 1780. The emotive function of an expletive "may often be the more important element of the overall message sought to be communicated," *Id.;*

so long as one does not incite violence, one should not be forced to express one's anger or disapproval in measured terms.

██ Thus, when we ask whether Campbell had probable cause to arrest Johnson for disorderly conduct, we must interpret the Delaware Code to prohibit only that speech that falls into the narrow category of "fighting words," and not speech that is simply disputatious, emotionally charged, or profane. Armed with a fuller understanding of the First Amendment restrictions, we can now turn to the facts before us.

First, we must ascertain precisely what "conduct" of Johnson's formed the basis for his arrest. Campbell argues in his brief that Johnson was arrested not just for his words, but for his actions during the entire encounter, including his "verbal harass[ment]" of Campbell and his refusal to comply with Campbell's request for identification. However, this contention is not supported by the record, even when taken in the light most favorable to Campbell. Rather, it is clear from Campbell's unequivocal and uncontroverted testimony at trial that Johnson was arrested solely for the words he spoke. When Campbell was asked directly why Johnson had been arrested for disorderly conduct, he replied that Johnson had breached the peace by "[u]sing profane language in public." We find unavailing Campbell's attempt to justify the arrest on different grounds on appeal, when he repeatedly testified that he arrested Johnson on the basis of his words.

Furthermore, viewed objectively, none of Johnson's other actions, as described by Campbell himself, amounted to threatening or tumultuous behavior. What John-

son did was sit in the van, refuse Campbell's requests for identification, demand to know why he had been stopped, and question Campbell's motives. The worst and most potentially disruptive thing he did during the entire encounter was mutter "son of a bitch;" it was those words that immediately precipitated his arrest.[10]

Since Johnson was arrested for the words he spoke, the question must be whether Campbell had probable cause to believe that Johnson's words were "fighting words." Again, Campbell's testimony on this point is conclusive. When asked whether Johnson's words "cause[d] anybody to fight or become angry," which is the very definition of "fighting words," Campbell's response was, "No, not that I am aware of, no fighting, no angry, no, no one became angry." Thus, Campbell himself testified that the words did not cause him, Johnson, or the onlookers to become angry or provoke anyone to fight. Here, as in *Cohen*, the words were emotionally expressive of Johnson's displeasure with the way Campbell was handling the situation. Johnson's words were unpleasant, insulting, and possibly unwise, but they were not intended to, nor did they, cause a fight. As Johnson's words were not "fighting words," Campbell had no probable cause to arrest him for disorderly conduct.

Our conclusion is consistent with case law from other circuits. Two other federal courts of appeals have also held that swear words, spoken to a police officer, do not provide probable cause for an arrest for disorderly conduct because the words, as a matter of law, are not "fighting words." In a situation akin to that here, the Court of Appeals for the Eighth Circuit reversed

---

**10.** There is some question as to whether Johnson directed his words at Campbell or simply said them to express his frustration. Given our standard of review, we must accept Campbell's testimony, that Johnson directed the words at him, as true. Either way, our conclusion (indeed, Campbell's conclusion as well) that the words were not "fighting words" remains the same.

a jury verdict in a section 1983 case for the defendant police officers and granted judgment as a matter of law to the plaintiff, holding that her arrest for disorderly conduct was not based on probable cause. *See Buffkins v. City of Omaha,* 922 F.2d 465 (8th Cir.1990). In *Buffkins,* the police arrested the plaintiff after she said to them, "I will have a nice day, asshole." *Id.* at 467. The court held that because there was no evidence that her speech was an incitement to immediate lawless action, neither officer contended that she had become violent or threatened violence, and her "use of the word 'asshole' could not reasonably have prompted a violent response from the arresting officers," the officers had no probable cause to arrest her.

Similarly, in *Duran v. City of Douglas,* 904 F.2d 1372 (9th Cir.1989), the Court of Appeals for the Ninth Circuit held that the defendant police officer was not entitled to qualified immunity against a claim under section 1983 that he had wrongfully stopped and arrested the plaintiff for disorderly conduct after the plaintiff made "obscene gestures toward him and yell[ed] profanities in Spanish while traveling along a rural Arizona highway." *Id.* at 1377. The court explained that it did not condone the plaintiff's conduct, which was "boorish, crass, and ... unjustified." *Id.* But, the court went on, "disgraceful as [the plaintiff]'s behavior may have been, it was not illegal; criticism of the police is not a crime." *Id.* (citing *Hill,* 482 U.S. at 461–63, 107 S.Ct. 2502). Because the plaintiff's conduct took place late at night on a deserted road, it "could not have disturbed the peace or incited a riot," therefore the officer did not have any cause to stop him, let alone arrest him. *Id.*

Campbell urges us not to confuse the probable cause standard governing Johnson's arrest with the higher standard required to convict him, and argues that even if Johnson's actions did not actually constitute disorderly conduct, Campbell still reasonably believed that Johnson was committing a crime under Delaware law because he uttered profane words in public. Campbell appears to be arguing that an officer may arrest someone even if the officer has an erroneous understanding of what constitutes a crime. Although this sounds a bit like a qualified immunity defense, Campbell did not raise qualified immunity in the pleadings and does not phrase it as such before us. Rather, he asks us to find that probable cause to arrest may exist even if predicated on a flawed view of what is prohibited by the disorderly conduct statute.

This cannot be. While it is true that the standard for probable cause is less than the standard for conviction, *see DeFillippo,* 443 U.S. at 36, 99 S.Ct. 2627, we must still ask the question as to whether a reasonable officer would have had cause to believe that a *crime* was being committed. Campbell believed that the simple act of speaking a profane epithet in public amounted to a criminal breach of the peace. He did not believe that the words needed to cause anyone to fight or become angry. Campbell was simply wrong about what Delaware law prohibits. He cannot now justify Johnson's arrest by arguing that, under his own erroneous understanding, *he* had probable cause to believe Johnson was committing a crime. Probable cause is objective, not subjective; essential to probable cause is that an officer would be justified in believing that an *actual offense* was being committed.

Here, what Campbell believed Johnson had done – speak profane words in public – is not a crime, therefore Campbell could not have had probable cause to believe a crime was being committed. It is the same as if an officer, believing that a statute that prohibited crossing the street on a red light actually prohibited crossing

the street at all times, arrested someone who crossed the street on a green light. No matter the strength of the evidence that the person arrested did in fact cross the street, the officer could not have had probable cause to believe that a crime was being committed, because crossing the street on a green light is simply not a crime.

Therefore, because Campbell concedes that Johnson's words were not "fighting words," and thus could not have properly believed that Johnson was committing the crime of disorderly conduct, Johnson's arrest violated the Fourth Amendment.[11] Accordingly, we will reverse the District Court's denial of judgment as a matter of law on this claim.[12]

### III.

For the reasons given above, we hold that the evidence demonstrated neither that Officer Campbell had a reasonable, articulable suspicion that Johnson was engaged in criminal conduct when he stopped Johnson, nor that he had probable cause to arrest Johnson for disorderly conduct. We will therefore reverse the District Court's denial of judgment as a matter of law with respect to Johnson's claims that the stop and the arrest violated his Fourth Amendment right to be free from unreasonable seizures, grant him judgment as a matter of law, and remand to the District Court for a trial on damages. We will affirm the District Court's order in all other respects.

---

11. As with the stop, in addition to finding that the arrest did not violate Johnson's right to due process, the jury also found that it was not "due to racial discrimination." For the same reasons given regarding the stop, *see* n. 210 *supra*, we will affirm the District Court's denial of judgment as a matter of law and a new trial regarding racial discrimination.

12. Johnson also complains that the jury instructions were incomplete in two key respects: the "reasonable suspicion" required for a stop and the description of a "disorderly conduct" offense. As we reverse and need not decide this case on this basis, we will not opine on this issue, but note that in light of the facts of this case and the principle that the District Court should insure that the instructions do not confuse the jury, *see United States v. Fischbach & Moore, Inc.,* 750 F.2d 1183, 1195 (3d Cir.1984), the District Court's refusal to give the instructions desired by Johnson in both instances is troubling in that it may have left the jurors with a less than complete understanding of the guiding principles. In one instance, the Court refused to elaborate on the need for Officer Campbell to have had a "reasonable, articulable" suspicion in order to have cause to stop Johnson. In the other instance, the Court refused to add an instruction that would make clear that the crime of "disorderly conduct" requires speech to have been disruptive, as discussed above. The District Court's refusal may have amounted to an abuse of discretion. *See Montgomery County v. Microvote Corp.,* 320 F.3d 440, 445 (3d Cir.2003) (stating that a jury instruction is erroneous when it does not "properly appraise[ ] the jury of the issues and the applicable law").