**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 11-2145 and 11-3163

_____

UNITED STATES OF AMERICA,

v.

JERROD ABNEY,

Appellant in No. 11-2145

TERRELL DOBSON,

Appellant in No. 11-3163

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal No. 2-09-cr-00256-003 and
2-9-cr-00256-002)
District Judge: Hon. Cynthia M. Rufe

_____

Argued June 5, 2012

BEFORE: SCIRICA, GREENAWAY, JR. and COWEN,  <u>Circuit Judges</u>

(Opinion Filed:  September 12, 2012)

Catherine C. Henry, Esq.
Brett G. Sweitzer, Esq. (Argued)
Federal Community Defender Office of the
    Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106

David S. Rudenstein, Esq.
9411 Evans Street
Philadelphia, PA 19115

      Counsel for Appellants Jerrod Abney and
          Terrell Dobson

Bernadette A. McKeon, Esq. (Argued)
Robert A. Zauzmer, Esq.
Office of the United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

      Counsel for Appellee United States of America

———————

OPINION

———————

COWEN, Circuit Judge.

Jerrod Abney and Terrell Dobson appeal from the criminal judgments entered by United States District Court for the Eastern District of Pennsylvania. They specifically challenge the District Court's denial of their respective suppression motions and, in particular, its determination that the police possessed the requisite reasonable suspicion to conduct a Terry stop. Although this is a very close case, we will affirm.

I.

Appellants, together with Johnny Cobb, were indicted on various counterfeit and identity-related charges. Following an evidentiary hearing, the District Court denied Cobb's motion to suppress and entered an opinion setting forth its formal findings of fact

and conclusions of law ("Cobb"). See United States v. Cobb, Criminal No. 09-256-1, 2009 WL 3806764 (E.D. Pa. Nov. 12, 2009). Additional evidentiary hearings were then held on Appellants' respective suppression motions, and the parties also agreed to incorporate the record from Cobb's suppression proceeding. In the end, the District Court denied the motions to suppress filed by Appellants. It accordingly issued another opinion that set forth its formal findings of fact and conclusions of law and that also incorporated by reference the Cobb findings of fact ("Dobson"). United States v. Dobson, Criminal Nos. 09-256-2, 09-256-3, 2010 WL 2527785 (E.D. Pa. June 18, 2010). Neither Appellants nor the government expressly challenge the District Court's findings of fact, and we accordingly turn to the findings set forth in Dobson.

On the afternoon of March 12, 2009, a police officer from the Upper Merion Police Department pulled over a vehicle occupied by Appellants (and Cobb) at the King of Prussia Mall in suburban Philadelphia. This stop took place as a result of information provided to the police by Richard Verna, a Bloomingdale's loss prevention detective. Simply put, Verna contacted the police regarding two men who had purchased—or had attempted to purchase—Fendi handbags using credit cards and New York identification. These two men were subsequently identified as Dobson and Abney.

Initially, Verna called the Upper Merion Police Department dispatcher:

He told dispatch that he had been following a man that he believed to be involved in credit card fraud, and that the man had attempted to use two cards that were declined. Verna added that the man had presented New York identification, and that Bloomingdale's "had been having issues with individuals from New York using stolen cards to purchase handbags." Verna provided the tag information and make and model of the first

3

suspect's vehicle, and mentioned that he would be waiting for law enforcement at the crosswalk.

Id. at *2 (footnotes omitted).

A few minutes after this call, Verna met with Officer Susan Bednar at the crosswalk connecting the two main sections of the Mall (the Court and the Plaza). He then provided the police officer with the following account:

> Verna briefly described what had happened, and gave Bednar the tag information, make and model of the vehicle he had previously seen. He also described the two individuals, explaining that they had attempted to buy Fendi handbags, one of them successfully. He also noted that Bloomingdale's had previously experienced problems with individuals with New York identification committing credit card fraud.

Id. (footnotes omitted). Bednar relayed these comments to her backup, Officer Burkett, who then broadcasted the vehicle description via police radio.

Shortly thereafter, Corporal Brazunas stopped a vehicle matching the description (i.e., a green SUV with the same New York tag number) driving on the Mall's ring road. Police subsequently discovered, inter alia, fraudulent credit cards as well as thousands of dollars worth of consumer merchandise.

Appellants have presented two basic grounds for suppression: (1) "they allege that their Fourth Amendment rights were violated when Corporal Brazunas performed the traffic stop because there was no reasonable suspicion that a crime had been committed;" and (2) "Defendants assert that the frisks conducted by police officers, which led to the discovery of counterfeit credit cards, were not supported by safety concerns or the

4

requisite level of cause."[1] Id. at *3.  After considering in some detail the relevant legal principles, the factual circumstances, and the parties' arguments, the District Court, among other things, formally concluded that:  (1) the information provided by Verna and his fellow Bloomingdale's employees was sufficiently reliable to provide a sufficient basis for a Terry stop; and (2) relying on the information thereby provided, the decision to seize the vehicle was supported by reasonable suspicion and did not violate the Fourth Amendment.

While Cobb was tried and acquitted, Appellants entered written plea agreements and conditional guilty pleas.  The District Court sentenced each Appellant to 30 months of imprisonment and 3 years of supervised release.  Their subsequent appeals have been consolidated.

## II.

The District Court possessed subject matter jurisdiction over this criminal matter pursuant to 18 U.S.C. § 3231.  We have appellate jurisdiction under 28 U.S.C. § 1291.

This Court exercises plenary review over a district court's reasonable suspicion or probable cause determination but applies a clear error standard of review with respect to the underlying findings of fact.  See, e.g., United States v. Whitfield, 634 F.3d 741, 743-44 (3d Cir. 2010).

## III.

---

[1]  Cobb also alleged "that the Bloomingdale's employees' report was racially biased" and made "in bad faith."  Cobb, 2009 WL 3806764, at *4.  The District Court rejected these allegations as factually unsupported.  We note that Appellants, who, like Cobb, are

5

It is well established that a police officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)). A court therefore must consider the totality of the circumstances to determine whether there is reasonable suspicion for a Terry stop. See, e.g., United States v. Arvizu, 534 U.S. 266, 273-74 (2002). Reasonable suspicion is "a less demanding standard than probable cause," although it still requires "at least a minimal level of objective justification for making the stop." Wardlow, 528 U.S. at 123 (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)). In other words, there still must be more than "a mere 'hunch.'" Arvizu, 534 U.S. at 274 (quoting Terry, 392 U.S. at 27). In the end, the police must possess a particularized and objective basis for suspecting a particular individual of criminal activity. See, e.g., United States v. Goodrich, 450 F.3d 552, 559 (3d Cir. 2006).

Furthermore, law enforcement expertise and training may be taken into consideration, and reasonable suspicion may thereby arise from conduct that otherwise appears to be lawful on its face. See, e.g., Johnson v. Campbell, 332 F.3d 199, 205-11 (3d Cir. 2003). The police may also rely on information furnished by a tipster or informant, provided that such information carries sufficient "indicia of reliability." Adams v. Williams, 407 U.S. 143, 147 (1972). Accordingly, the veracity, reliability, and basis of knowledge of the tipster or informant are all relevant considerations. See, e.g., Illinois v. Gates, 462 U.S. 213, 230 (1983). The tip must generally "be reliable in its

_____

both African American, do not raise any express claims of racial profiling or bias.

6

assertion of illegality, not just in its tendency to identify a determinate person." Florida v. J.L., 529 U.S. 266, 272 (2000) (citation omitted). We have identified a number of factors to be considered in this inquiry, including whether the police officer had a face-to-face meeting with the tipster, whether the tipster can be held responsible if the tip turns out to have been fabricated, whether the information is within the unique knowledge of the tipster, whether the tipster recently witnessed the suspicious activities, and whether the tip provided the police with the means to test the tipster's knowledge or credibility. See, e.g., United States v. Brown, 448 F.3d 239, 249-50 (3d Cir. 2006).

In the end, a court must determine whether the information provided to the police is sufficient to raise a reasonable suspicion that the person in question is engaged in criminal conduct. See, e.g., Goodrich, 450 F.3d at 560; United States v. Valentine, 232 F.3d 350, 355 (3d Cir. 2000)). Of particular significance here, only the facts known to the police at the time of the stop itself may be considered. See, e.g., Brown, 448 F.3d at 245 ("Only then can we evaluate the presence or absence of reasonable suspicion, as we must consider only 'the facts available to the officer at the moment of the seizure.'" (quoting Terry, 392 U.S. at 21-22)); United States v. Ubiles, 224 F.3d 213, 218-19 (3d Cir. 2000) ("As noted above, [t]he reasonableness of official suspicion must be measured by what the officers knew *before* they conducted their search.'" (quoting J.L., 529 U.S. at 271)).

We agree with the District Court that the tip received by the Upper Merion police officers was "reliable, truthful, and based in the knowledge of the reporting informants."

Dobson, 2010 WL 2527785, at *5.  Although Appellants take issue with the various points raised by the government and the District Court, we believe that the District Court appropriately noted that the police received all of the information from a Bloomingdale's loss prevention detective, who had gathered the facts from either his own observations or those of other Bloomingdale's employees.  The reliability of the loss prevention detective's tip was further "bolstered by the face-to-face meeting" he then had with Bednar.  Id. at *4.  Furthermore, "Verna's position as a Loss Prevention Officer lends significant credence to the fact that his report was based on his experience and interest in detecting suspicious behavior at Bloomingdale's."  Id.  We note that, as of March 2009, Verna had approximately five years of experience working as a loss prevention detective at a number of retail establishments.  Like his co-workers, he could then be held responsible by both the police and his own employer for the information he had provided.  Finally, it appears uncontested that several of the police officers, including Bednar herself, had significant experience responding to reports of credit card fraud and other kinds of consumer crimes from  loss prevention officers working at what is one of the largest malls in the country.

We now turn to the content of the tip itself.  Relying on Dobson, Appellants observe that "the district court found that Mr. Verna told the police dispatcher and/or Officer Bednar" the following:

- a man [later identified as Dobson] had bought a Fendi handbag using a credit card and presenting a New York identification;

- sometime later, another man [later identified as Abney] tried to buy a Fendi handbag, presenting New York identification and two credit cards that were declined;

- Bloomingdales had previously had trouble with credit-card fraud with people from New York;

- the first man got into a green sport-utility vehicle with New York license plate EPZ-7065; and

- the second man was followed through the mall to the crosswalk connecting the Court and the Plaza.

(Appellants' Brief at 10-11 (citing Dobson, 2010 WL 2527785, at *2).)  According to Appellants, the police were not told that the man subsequently identified by Dobson had been involved in a prior handbag transaction at this department store, in which he also had used a credit card and New York identification, and had been deemed to be suspicious.  Likewise, they claim that the police did not know that Dobson had made his most recent purchase in a hurried and suspicious fashion.  It also appears that Verna failed to provide the police with a particular time frame for what had just occurred at the department store.  Appellants therefore contend that the government has nothing more than "two African-Americans from New York, never seen together, buying Fendi handbags an unknown time apart at a major department store in one of the nation's largest malls."  (Appellants' Reply Brief at 2 (footnote omitted) (citation omitted).)

The government generally does not challenge Appellants' account of what was said—and not said—to the police.[2]  It recognizes in its appellate brief that the District

---

[2] At oral argument, the government does claim that the police were told that the first purchaser had been seen on a previous occasion with a New York identification.  It cites

9

Court "appropriately applied the reasonable suspicion test based on what was actually reported to the police by Verna." (Appellee's Brief at 25 n.6.) However, the government also states the following: "Verna believed that the two suspects were working together, based on information that Dobson was immediately recognized by the handbag clerk and had earlier been flagged by store security as 'suspicious,' the rapid nature of the first purchase, the fact that both suspects were from New York, and the fact that both transactions occurred close in time to one another." (Id. at 24-25.) While recognizing that Verna "apparently did not relay [these] facts supporting this belief," the government nevertheless adds that "the police were justified in relying on Verna's belief." (Id. at 25.) In its subsequent discussion of "the totality of the circumstances," the government goes on to observe that Dobson "appeared suspicious" and was "acting quickly" and that Abney then arrived "within mere minutes" of Dobson's transaction. (Id. at 26.)

We find that the government's conduct is, at the very least, troubling. We expressly disapprove of its attempt in its appellate brief to put forth a justification for the

to Verna's testimony in support of this claim. However, in the first instance, he merely stated that he told Bendar "that the last time that we had a suspicious transaction in the store, my supervisor told me that there was a New York ID that he used." (JA305.) Verna did go on to provide an affirmative answer when asked on cross-examination whether he told Bednar "that the person had been there another time and used a New York ID." (JA319.) In its own appellate brief, the government nevertheless fails to refer to this testimony or even claim that Verna otherwise passed this particular piece of information on to the police. As the government acknowledges at oral argument, Appellants themselves address this testimony in a footnote in their opening appellate brief. In the end, the District Court specifically found that Verna told Bednar "that Bloomingdale's had previously experienced problems with individuals with New York identification committing credit card fraud." Dobson, 2010 WL 2527785, at *2 (footnote omitted).

stop based on information that it knew was actually unknown to the police at the time of the stop itself. It likewise can take little refuge in the fact that the Assistant United States Attorney who presented its case at oral argument was not the author of its own appellate brief. The government's obligation, especially in a criminal proceeding, is one of frankness, fairness, and doing justice to all. Although it ultimately prevails in this matter, we give the government little credit here for the integrity that we expect and usually receive.

We also note that the parties agree that the record in this case actually contains what the District Court called, in its reliability discussion, "a few discrepancies" regarding what was told to the police. Id. at *4. For instance, the dispatch notes and a police report indicated that Verna said that one individual had attempted to use three credit cards, two of which were declined and the third of which was ultimately approved. In its Cobb opinion, the District Court actually made findings of fact to this effect. See Cobb, 2009 WL 3806764, at *1 ("The dispatch reporting the incident to which Bednar and Burkett responded stated that a Bloomingdale's employee observed a man attempt to purchase an expensive Fendi handbag using multiple credit cards. After the customer's first two cards were denied, he then used a third card to successfully complete the purchase. He showed the employee a New York identification card." (footnote omitted)).

In the end, we are presented here with a very close case. We—reluctantly—agree with the District Court that the information "gave officers a particularized and objective basis for stopping the vehicle." Dobson, 2010 WL 25277785, at *5. Specifically, the

11

police were told the following facts by a loss prevention detective working for a major department store:  (1) a man had bought an expensive brand-name handbag using a credit card and New York identification; (2) another man then had tried to buy a handbag made by the same brand with a New York identification, but the two credit cards he had presented were both declined; and (3) the department store "'had been having issues with individuals from New York using stolen cards to purchase handbags,'" id. at *2 (footnote omitted).  In turn, the current factual circumstances are sufficiently distinguishable from the facts present in our decision in Johnson v. Campbell, 332 F.3d 199 (3d Cir. 2003), in which we determined that the record was critically lacking in any evidentiary support for the jury's finding of reasonable suspicion, id. at 201-11.  We are currently confronted with more than, for instance, a report from a motel clerk (a former police officer who was understandably nervous because she was a victim of a prior robbery) who had observed otherwise innocent behavior on the part of a seemingly jittery individual (i.e., drinking coffee and paging through newspapers where both the coffee and the newspapers were actually provided by the motel itself).  Id.  In contrast, the Upper Merion police officers received information from a department store detective indicating that there were two men from another state who had been shopping for the very same brand of expensive handbags, one of the customers had been unable to complete his purchase even after presenting two credit cards, and the department store itself had actually been having problems with persons from this other state using stolen credit cards to purchase the very same kind of products.

12

Given the factual circumstances as well as the nature of the "reasonable suspicion" standard itself, we ultimately reject Appellants' challenge to the District Court's <u>Terry</u> determination. We likewise conclude that the District Court properly determined that the subsequent pat-down searches of Appellants passed constitutional muster. Taken into account the heavy tint on the vehicle as well as the fact that the passenger in the back seat (Abney) was moving around and then put his right hand down at his feet, a protective frisk of Abney was clearly appropriate. <u>See, e.g.,</u> <u>Arizona v. Johnson</u>, 555 U.S. 323, 332 (2009). Likewise, the pat-down search of the second passenger (Dobson) was justified as a search incident to arrest because there was probable cause to arrest and search him "after the discovery of contraband [counterfeit credit cards] on another occupant of the vehicle [Abney]," <u>Dobson</u>, 2010 WL 2527785, at *6. <u>See, e.g.</u>, <u>Rawlings v. Kentucky</u>, 448 U.S. 98, 111 (1980).

IV.

For the foregoing reasons, we will affirm the criminal judgments entered by the District Court.

GREENAWAY, Jr., dissenting.

I fear that the majority's affirmance, while qualified, will lead to the improvident denial of suppression motions in instances when reasonable suspicion, as required by the Fourth Amendment, is absent. When the biases of private citizens may enter into the government's justification for search and seizure, there is cause for concern. The majority acknowledges that this is "a very close case," (Majority Op. at 1) but nonetheless finds that police had a sufficient "level of objective justification" for stopping the vehicle in which Dobson and Abney rode. *Illinois v. Wardlaw*, 528 U.S. 119, 123 (2000) (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). I dissent because the justification for the stop was far from objective. Instead of relying upon "specific and articulable facts" along with "rational inferences from those facts" to determine that reasonable suspicion of criminal activity existed, *Terry v. Ohio*, 392 U.S. 1, 21 (1968), police imported the insufficiently supported belief of a loss prevention detective with no law enforcement experience into their own analysis. We are prohibited from relying on such a "mere hunch," as we should be. *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citations and internal marks omitted).

Without Richard Verna's hunch, police would not have been able to reasonably link Dobson and Abney, and without such a link, reasonable suspicion for the stop of the vehicle was absent. Dobson was observed entering the vehicle that was eventually stopped; Abney was not. At the time of the stop, all police knew about Dobson was that he was an African-American resident of New York who had successfully purchased an

1

expensive brand-name handbag. (Majority Op. at 8-9.) Although innocent acts "may collectively amount to reasonable suspicion," *United States v. Nelson*, 284 F.3d 472, 480 (3d Cir. 2002), without connecting Abney to Dobson, and thus to the vehicle, reasonable suspicion to connect the vehicle to criminal activity would have been absent. Bracketing, for a moment, the import of Verna's belief that Abney and Dobson were together, the only facts known to police that could serve to link them were: (1) that both haled from New York, a state of more than nineteen million people located within two hours' drive of the mall; (2) that both were interested in purchasing expensive handbags of the same manufacture from Bloomingdale's on the same day; and (3) that both were African-American. This hardly seems like a sufficient basis to conclude that they were travelling in the same vehicle and thus working together.[1]

We agree with the majority that Verna was a reliable tipster. (Majority Op. at 7-8.) Nonetheless, even assuming that Verna's report can be considered completely reliable, we are still permitted to use it only as a source of the "specific and articulable facts," that, together with "rational inferences from those facts," must form the basis for reasonable suspicion. *Terry*, 392 U.S. at 21. Verna's belief that the two men were together, to the extent not supported by facts he provided to the police, cannot be part of

---

[1] Although the majority's opinion notes that Appellants do not explicitly raise allegations of racial profiling or racial bias, Appellants do not shy away from mentioning their race in the short catalogue of facts used to connect them. (Majority Op. at 9.) Indeed, it is difficult to imagine that these facts would have been deemed sufficient to connect the two men had they not both been members of the same racial minority.

2

our reasonable suspicion analysis. Although Verna's belief was supported by some additional facts, i.e. that Dobson had made his purchase with suspicious speed and that he and Abney approached the handbag counter separately but close in time, those facts were never conveyed to the police and thus cannot be part of our analysis here.

Put differently, if a police officer had directly observed all three of the specific, articulable facts that Verna conveyed to the police supporting a link between Dobson and Abney, it would not be a "rational inference[ ] from those facts," *Terry*, 392 U.S. at 21, that Abney was connected to Dobson and thus to the vehicle. The officers' conclusion that the two men were together, based solely on those facts, would be precisely the type of "mere hunch" upon which the Fourth Amendment prohibits us from relying in order to justify a *Terry* stop. *Arvizu*, 534 U.S. at 274. Our jurisprudence is clear that police may trust facts provided by reliable tipsters, but it does not allow tipsters more latitude to insert their assumptions into the Fourth Amendment calculus than it would allow police officers.

For these reasons, I would find that reasonable suspicion for the stop was absent and that all the subsequent searches were thus "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992). As such, I dissent.