

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-22-2006

# USA v. Brown

Precedential or Non-Precedential: Precedential

Docket No. 05-1723

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Brown" (2006). *2006 Decisions.* Paper 994.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/994

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-1723

UNITED STATES OF AMERICA

v.

KAREEM BROWN,

Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Action No. 03-cr-00683-1)
District Judge: Honorable Timothy J. Savage

Argued January 17, 2006

Before: BARRY,  AMBRO and ALDISERT, <u>Circuit Judges</u>

(Filed: May 22, 2006)

Thomas F. Burke, Esquire (Argued)
Law Office of William J. Brennan
123 South Broad Street, Suite 1970
Philadelphia, PA   19109

      Counsel for Appellant

Patrick L. Meehan
  United States Attorney
Robert A. Zauzmer
  Assistant United States Attorney
  Chief of Appeals
John N. Joseph
  Assistant United States Attorney
Karen L. Grigsby, Esquire (Argued)
Office of United States Attorney
615 Chestnut Street
Philadelphia, PA   19106

      Counsel for Appellee

------

OPINION  OF  THE  COURT

------

AMBRO, <u>Circuit Judge</u>

Kareem Brown appeals the denial by the United States District Court for the Eastern District of Pennsylvania of his motion to suppress evidence.  Brown argues that he was

2

improperly stopped and searched, and thus the incriminating evidence uncovered by that search was not properly admitted at his trial. We agree, and accordingly reverse the District Court's denial of Brown's motion to suppress and vacate his conviction.[1]

## I. Factual Background

Our facts are taken from the suppression hearing held by the District Court. On the evening of June 1, 2003, Jelena Radenkovic and Lucia Zapatero were walking in the 2100 block of Locust Street in Philadelphia. They were approached by two black male teenagers who attempted to grab Radenkovic's purse. She refused to let go, and one of the males pointed a gun at her. She turned and walked away from him. The males then abandoned the robbery attempt and ran south on 22nd Street.

Moments after the attackers fled, Radenkovic called 911 to report the robbery to the police. In the course of that call, Radenkovic described the robbery suspects as African-American males between 15 and 20 years of age, one 5' 8" and the other 6', wearing dark, hooded sweatshirts and running south on 22nd Street. Immediately after calling 911, Radenkovic called her friend, William Firth, who was waiting to meet her at a nearby restaurant. Radenkovic told Firth about the attempted robbery

---

[1]Because we reverse on the ground that the stop of Brown was not supported by reasonable suspicion, we express no opinion as to the lawfulness of the frisk independent of the stop.

and described the suspects, providing "just the clothing, the general description. I didn't go into too many details, but in enough detail."

Minutes later, a police officer, who was not identified in the record, arrived and took a second description from Radenkovic. That officer then relayed the description over the police radio. The parties contest the content of the broadcast. The Government states the broadcast "described the two suspects as black males in their teens or 20's with dark clothing." Brown asserts the printout of the radio call reads: "Black male, black hoody, last seen on Locust, attempted to grab female's purse. Location: westbound on Locust[2], both 16-18. The description reads: six-one, gray hoody, black pants; number two: five-nine, thin, navy blue hoody." The District Court's findings of fact state that the broadcast consisted of the description Radenkovic had provided in her call to the 911 operator. The Court found that, while the officer was speaking over the radio and describing one of the suspects as 15 years old and the other as three or four years older, Lucia Zapatero commented that she thought the suspects were older, in their early twenties.

Within minutes of the police broadcast, Radenkovic, who

---

[2]At all other places in the record the suspects are described as running southbound on 22nd Street. This discrepancy in the printout of the radio call is not material for our opinion.

was sitting in the police car at this point, received a call from Firth, who stated he had just seen two men fitting the descriptions of the robbery suspects at 22nd and Lombard Streets (a location three blocks south of Locust Street).[3] The Court also found that a second officer, Kathleen Pacheco, who arrived on the scene at that time, heard Radenkovic exclaim "that the guys who had robbed her were at 22nd and Lombard Streets."

Based on Radenkovic's comments, Officer Pacheco drove to 22nd and Lombard Streets and en route issued a radio call with the location information provided by Radenkovic. Upon arriving, Pacheco observed two black males, Kareem Brown and Jerome Smith, who appeared to be coming out of a store with cups of coffee. Pacheco issued another radio call, stating that she "had in [her] sight the two men that were described [in] the [broadcast]." The following exchange took place between Officer Pacheco and the Court about her statement that the men matched the description of the suspects:

> The Court: In what way did they match the

_____

[3]There is some discrepancy between the findings of fact and Radenkovic's testimony that Firth told her "these *may* be your guys" and that she said to police "our guys *may* be on 22nd and Lombard. My friend just called me. . . . They *may* be our guys." (emphases added). The District Court clarified this testimony by asking: "They may be?" and Radenkovic responded: "Yes, may be."

5

|                   | description?                              |
|-------------------|-------------------------------------------|
| Officer Pacheco:  | From the radio --                         |
| The Court:        | What way?                                 |
| Officer Pacheco:  | That they were two black males with dark clothing. |
| The Court:        | That's it?                                |
| Officer Pacheco:  | That's what we received.                  |

On the date of the attempted robbery, Brown, the appellant in this case, was 27 years old, 6' tall, and had a full beard. Smith was 31 years old, 5'8" tall, and also had a full beard.

Meanwhile, a third officer, Officer Marano Santiago, had received the call with the location tip from Officer Pacheco and arrived at 22nd and Lombard Streets at approximately the same time. Santiago observed Smith and Brown as they were walking across the street and hailing a taxi. He testified that the men were walking normally and were not out of breath. He also stated it was not unusual to see two black males at that location, as there is a predominantly black neighborhood less than two blocks away.

Officer Santiago testified as well that Smith and Brown fit the description he received over the radio, in that they were black males of the described height in dark clothing. Santiago agreed at the suppression hearing that "two black males [] wearing dark clothing is a very general description." In fact, at some point before leaving his vehicle, Santiago had called for a more specific description of the suspects, but did not receive any

6

additional information.[4]   Santiago summed up by stating that

_____

[4]The following exchange took place between the Court and Officer Santiago after he testified that he had called in for additional descriptive information:

| | |
|---|---|
| Officer Santiago: | All I was looking for was black clothing, two black males. |
| The Court: | That's all you remember? |
| Officer Santiago: | That's correct. |
| The Court: | So what happened when you called and said, I want more information, what did they give you? |
| Officer Santiago: | They gave me– what I requested was anymore [sic] clothing. They keep saying, black clothing. |
| The Court: | That's what you recall them saying? |
| Officer Santiago: | That's what I recall. |
| The Court: | What else did they give you? |
| Officer Santiago: | Basically, that was it, just black clothing. |
| The Court: | Where did you get his height from? |
| Officer Santiago: | The height? From [the radio broadcast]. |
| The Court: | So you had a height? |
| Officer Santiago: | Yes. |
| The Court: | And you had two black males. |
| Officer Santiago: | That's correct. |
| The Court: | You had a gun? |
| Officer Santiago: | Correct. |
| The Court: | What else did they give you? |

7

"[t]hey were the only two black males at that location[.]   That was the only reason why those two males were stopped by me and they were investigated by me." Indeed, he testified that he would have stopped them even "if they were both five feet tall wearing white clothes."

Officer Santiago then approached Smith and Brown, told the taxicab to keep moving, and informed them that they looked like two persons who had attempted to commit a robbery and that he wanted to talk to them.

> I told them basically what happened at 22nd and Locust.  I told them that I need to make an investigation on both males.  It was a nice, brief conversation we had.  I let them know that we were having the complainant, the victim of the robbery, coming over to 22nd and Lombard to see if they were the doers.  If they weren't, they were free to go.  At that point, as we were waiting, I demanded both males for my safety and their

Officer Santiago:   What else? That's all I can recall. That was it.

8

> safety that I was going to pat them
> down.

Officer Santiago testified that he wanted to pat them down because

> there was a robbery committed at
> 22nd and Locust . . . .  For my
> safety at that point, I felt that I
> should pat them down.  Like I said,
> they were not at that point –  they
> were not apprehended at any point.
> They complied with my demands,
> so I felt it was my right for me to
> pat them down.

Santiago also stated, in response to questioning by the Court, that he had decided to pat down the defendants regardless whether they ran away or complied.

The District Court found that, as Santiago "attempted to frisk him, Brown struggled and appeared to try to escape . . . . While he was facing the police car, Brown attempted to place his hand in his pocket, causing Santiago to restrain him . . . . Santiago placed Brown in handcuffs and then recovered a gun

from Brown's front belt area.**["]**[5]  The moment at which "Brown struggled and appeared to try to escape" was described in more detail by Officer Pacheco:

> Officer Santiago said to [Brown], ['C]ome on, I have to pat you down. We just have a job. You match the description.['] [Santiago] takes him over to the car, stands up against the car, turned him around, started to pat him, and he started to kind of like break away. With that, [Santiago] put him over the head of the car. You could see that he was fidgeting. I jumped on [Santiago's] back to keep [Brown] from getting his hands loose before we could cuff him . . . .

---

[5]At approximately the same time that Officer Santiago arrived at 22nd and Lombard Streets, Officer Kenyatta Abney arrived at that location. Officer Abney pursued Smith, who ran down Van Pelt Street, squatted behind a car and then came up with his hands raised in the air. Abney put Smith in handcuffs and then surveyed the area with other police officers. The survey resulted in the discovery of a gun behind the curbside tire of the vehicle behind which Smith had squatted. Smith is not a party to this appeal.

Officer Pacheco also stated that Brown placed his hands on the police car before his breakaway attempt. This version of events was supported by a report (called a "7549 report") summarizing the incident based on information the arresting officers provided to detectives shortly after the arrest. The 7549 report states that "[b]oth males had their hands placed on the hood of the police vehicle. Brown started to struggle while handcuffs were being placed on his hands."

A different version of the frisk was provided by Officer Santiago, who testified that "as soon as I requested both of them to put their hands on the vehicle, they made the intent to put their hands on the vehicle, they made the intent to put their hands on top of the car, but they never did. That's when [Smith fled]." After Smith ran, Brown "[had] the intent also to flee, but being that he was so close to me, I held him. We went into a little struggle."

Ultimately, police officers brought Radenkovic to the two locations where Brown and Smith were being held. Radenkovic informed the police that these were not the males who attempted to rob her; Brown and Smith had beards and the robbers did not, and Smith and Brown were much older than the robbers.

Brown moved to suppress the firearm found on him, claiming there was not reasonable suspicion for the stop. After a two-day evidentiary hearing, the District Court denied the motion.

11

The case then went to a jury trial. Brown was found guilty of being a convicted felon in possession of a firearm under 18 U.S.C. §§ 922(g) and 924(e). His sentence included 180 months imprisonment and five years supervised release. He appeals.[6]

## II. Discussion

The Fourth Amendment prohibits "unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002). But, under the exception to the warrant requirement established in *Terry v. Ohio*, 392 U.S. 1 (1968), "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Any evidence obtained pursuant to an investigatory stop (also known as a "*Terry* stop" or a "stop and frisk") that does not meet this exception must be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963); *United States v. Coggins*, 986 F.2d 651, 653 (3d Cir. 1993).[7]

---

[6]We have jurisdiction pursuant to 28 U.S.C. § 1291.

[7]The *Terry* analysis applies here even though the crime in question had already been completed. *United States v. Hensley*,

Before us is whether Officer Santiago had reasonable suspicion to stop and frisk Brown. If not, the firearm found on him must be suppressed as the fruit of an unlawful seizure. We review the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and we exercise plenary review over questions of law. *United States v. Coward*, 296 F.3d 176, 179 (3d Cir. 2002).

## A. When was Brown seized?

We begin by determining when the seizure of Brown occurred, as that is the moment "the Fourth Amendment becomes relevant." *Terry*, 392 U.S. at 16; *see Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003). Only then can we evaluate the presence or absence of reasonable suspicion, as we must consider only "the facts available to the officer at the moment of the seizure." *Terry*, 392 U.S. at 21-22; *see also Florida v. J.L.*, 529 U.S. 266, 271 (2000); *Johnson*, 332 F.3d at 205.

The Government urges us to hold that Brown was not seized until after the officers succeeded in handcuffing him,

---

469 U.S. 221, 229 (1985) ("[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion.").

13

which was after his attempted breakaway and the finding of the gun. Brown contends that he was seized earlier in the encounter, at the moment he submitted to Officer Santiago's show of authority by turning and placing his hands on the police vehicle. The benefit to the parties of having their characterization of the seizure adopted is significant – if the seizure occurred *after* Brown's apparent escape attempt, we must include that attempt in our analysis of reasonable suspicion. In contrast, if the seizure occurred *before* the attempted escape, it plays no role in the reasonable suspicion analysis. *See, e.g., Johnson*, 332 F.3d at 210. Flight from a lawful frisk or arrest can contribute to a finding of reasonable suspicion; thus, the timing of the seizure could tip the finding in favor of one party or the other. *See, e.g., Wardlow*, 528 U.S. at 124 ("[h]eadlong flight . . . is . . . suggestive of [wrongdoing]"); *United States v. Brown*, 159 F.3d 147, 149 (3d Cir. 1998) ("flight combined with other factors may support a warrantless stop and frisk").

A seizure occurs when there is either (a) "a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful," or (b) submission to "a show of authority." *California v. Hodari D*., 499 U.S. 621, 626 (1991). Put another way, when a seizure is effected by even "the slightest application of physical force," it is immaterial whether the suspect yields to that force. *Id*. at 625-26. In contrast, if a suspect in the absence of physical force does not submit to an officer's show of authority, there is no seizure and

14

no Fourth Amendment claim.  *Id*. at 626-27.  "[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person."  *Id*. at 628.

Here there was a clear show of authority when Santiago told Brown and Smith that a robbery victim was being brought over to identify them as possible suspects and, if they were not identified, they would be free to go – necessarily implying that they were not free to leave.  Santiago also said he "demanded" that the men submit to a pat-down.  This instruction "would have conveyed [] to a reasonable person" that "he was being ordered to restrict his movement."  *Id.*; *see also United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (suggesting that a reasonable person would not feel free to leave when he or she is confronted with "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled"); *Johnson*, 332 F.3d at 206 ("interaction became a stop" when officer persisted in asking defendant to roll down his car window after defendant had refused officer's first request).

Brown clearly submitted to this show of authority.  As Officer Pacheco testified, and the 7549 report confirms, Brown turned to face the police car and placed his hands on the vehicle

15

in response to Santiago's demand. (This conclusion is not meaningfully contradicted by Santiago's testimony that Brown had begun to move his hands to the vehicle, but did not complete the action.) Moreover, Brown's initial submission is not undercut by any subsequent attempt to flee. The facts before us are similar to those of *United States v. Coggins*, where a police officer began questioning the defendant and his companions, the defendant stood up and asked to go to the bathroom, the officer told him to wait, the defendant sat back down, then again stood and ran off. 986 F.2d at 652-53. We held that the defendant "initially yielded to [the officer's] authority by sitting back down," and there was thus a seizure "[e]ven though he fled soon thereafter." *Id*. at 654. Unlike the defendant in *United States v. Valentine*, Brown demonstrated more than "momentary 'compliance'" with the arresting officers' demands. 232 F.3d 350, 359 (3d Cir. 2000) ("Even if Valentine paused for a few moments and gave his name, he did not submit in any realistic sense to the officers' show of authority.") Brown first yielded to Santiago's authority by turning to face the police car and placing (or moving to place) his hands on the vehicle. It was only after this initial submission that he began to struggle.

16

**B. Was the seizure of Brown based on reasonable suspicion**?

Having determined when the seizure of Brown occurred, was it based on reasonable, articulable suspicion that Brown and his companion might be the robbery suspects? *Terry*, 392 U.S. at 19 (determining reasonableness after establishing moment of seizure). Reasonable suspicion is an "elusive concept," but it unequivocally demands that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). An officer's objective basis for suspicion must be particularized because the "demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." *Terry*, 392 U.S. at 22 n.18. At the same time, we must allow "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted); *see also United States v Nelson*, 284 F.3d 472, 476 (3d Cir. 2002). "The ultimate question is whether a reasonable, trained officer standing in [Santiago's] shoes could articulate specific reasons justifying [Brown's] detention." *Johnson*, 332 F.3d at 206.

In evaluating whether there was an objective basis for

17

reasonable suspicion, we consider "the totality of the circumstances – the whole picture." *Cortez*, 449 U.S. at 417; *Robertson*, 305 F.3d at 167. As our Court has observed,

> [t]he Supreme Court has repeatedly recognized that a reasonable suspicion may be the result of any combination of one or several factors: specialized knowledge and investigative inferences (*United States v. Cortez*), personal observation of suspicious behavior (*Terry v. Ohio*), information from sources that have proven to be reliable, and information from sources that – while unknown to the police – prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip (*Alabama v. White*).

*Nelson*, 284 F.3d at 478.

The factors that informed Officer Santiago's decision to stop and frisk Brown were (a) the police radio broadcast of a description of the robbery suspects and the extent to which Brown and Smith matched that description, (b) the radio call

18

from Officer Pacheco conveying the location tip provided by Firth, and (c) Santiago's personal observation of Brown and Smith at 22nd and Lombard Streets. Although Santiago conceded that Brown and Smith being "the only two black males at that location . . . was the only reason why those two males were stopped by me and they were investigated by me," we must consider only whether "a reasonable, trained officer standing in [Santiago's] shoes could articulate specific reasons justifying" the investigative stop of Brown. *Johnson*, 332 F.3d at 206. Thus, even if the initial radio broadcast and the conduct of Brown and Smith did not factor into Santiago's reasonable suspicion analysis, they must be included in ours. Although we examine each of the three factors in turn, our ultimate determination of reasonable suspicion requires us to consider these items not "in isolation from each other," but (as noted) as part of the "totality of the circumstances." *Arvizu*, 534 U.S. at 274.

1.    The radio broadcast

The first factor contributing to the totality of the circumstances was the initial radio broadcast describing the attempted robbery suspects and the extent to which Brown and Smith matched that description. The fact that "every detail provided [in a description] matched the details observed by the officers" can contribute to a finding of reasonable suspicion. *Nelson*, 284 F.3d at 483. The broadcast description in this case, however, fails to satisfy the Fourth Amendment's "demand for

19

specificity." *Terry*, 392 U.S. at 21 n.18.

The broadcast, as described in the District Court's findings of fact, identified the suspects as African-American males between 15 and 20 years of age, wearing dark, hooded sweatshirts and running south on 22nd Street, where one male was 5' 8" and the other was 6'.[8] In the more stringent context of probable cause, we have concluded that, "armed with information that two black males driving a black sports car were believed to have committed three robberies in the area some relatively short time earlier, [the officer] could not justifiably arrest any African-American man who happened to drive by in any type of black sports car." *United States v. Kithcart*, 134 F.3d 529, 532 (3d Cir. 1998) (though offering no opinion on whether there was sufficient reasonable suspicion for a *Terry* stop). Similarly, even the less stringent standard of reasonable

---

[8]Over 43% of Philadelphia's population is African-American. Jesse McKinnon, U.S. Dep't of Commerce, No. C2KBR/01-5, *The Black Population: 2000*, at 7 fig. 3 (2001), available at http://www.census.gov/prod/2001pubs/c2kbr01-5.pdf. The medium height for men age 20 and older in the United States is approximately 5' 8". Margaret A. McDowell et al., U.S. Dept. of Health & Human Servs., No. 361, *Anthropometric Reference Data for Children and Adults: U.S. Population, 1999–2002*, at 26 tbl.31 (2005). Officer Santiago also gave uncontested testimony that "it was in no way unusual to see two black males at that intersection" given the racial makeup of the neighborhood.

suspicion cannot be met by a description that paints with this broad of a brush.

By way of contrast, consider the facts of *United States v. Harple*, 202 F.3d 194, 196-97 (3d Cir. 1999), where reasonable suspicion was supported, along with other factors, when the suspects' car "substantially matched the description," including the two-toned color of the car, the presence of a third brake light in the rear window, and five or more young, white, male passengers. *See also Nelson*, 284 F.3d at 481 n.5 (finding support for reasonable suspicion when there was an "exact match of the unique description – car, plates, occupants and direction of travel").

To make matters worse, the match of Brown and Smith to even this most general of descriptions was hardly close. Among other things, the robbery suspects were described as between 15 and 20 years of age, but on the date of the stop Brown was 28 years old and Smith was 31 years old. Moreover, both Brown and Smith had full beards and the description of the suspects included no mention of any facial hair. Indeed, about the only thing Brown and Smith had in common with the suspects was that they were black. What we have is a description that, while general, is wildly wide of target. By no logic does it, by itself, support reasonable suspicion.

2.      The location tip

When, as here, one officer (Santiago) conducts a stop and frisk based on information provided by another officer (Pacheco), "a finding of reasonable suspicion to justify the stop require[s] the presentation of evidence by the government that the officer who issued the radio bulletin [Pacheco] had reasonable suspicion, not simply that it was reasonable for the arresting officer [Santiago] to have relied on the bulletin." *Coward*, 296 F.3d at 180; *see also United States v. Hensley*, 469 U.S. 221, 233 (1985) (when "the police make a *Terry* stop in objective reliance on a flyer or [radio] bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who *issued* the flyer or [radio] bulletin possessed a reasonable suspicion justifying a stop.") (emphasis in original); *Nelson*, 284 F.3d at 481 (when officers' stop was based on match of defendants with broadcast information, "the reasonableness of the stop . . . depends on the reliability of the tip itself"); *Rogers v. Powell*, 120 F.3d 446, 453 (3d Cir. 1997) ("The legality of a seizure based solely on statements issued by fellow officers depends on whether the officers who *issued* the statements possessed the requisite basis to seize the suspect.") (emphasis in original).  Our focus is thus the first source – Officer Pacheco.  Would the location tip give "a reasonable, trained officer standing in [her] shoes" reasonable suspicion to order the stop?  *Johnson*, 332 F.3d at 206.

Pacheco's information regarding the location of the

22

suspects was based on comments by the victim, Radenkovic, relaying observations by Radenkovic's friend, William Firth. "It is well settled that reasonable suspicion can be based on information gathered from another person." *Robertson*, 305 F.3d at 168; s*ee also Johnson*, 332 F.3d at 206 (noting that "officers may rely on a trustworthy second hand report, if that report includes facts that give rise to particularized suspicion"). Both our Court and the Supreme Court have considered the reliability of tips from citizens in several *Terry* stop cases, but almost always in the context of anonymous informants. In the typical case, an unidentified person calls the police and reports a man with a gun standing at a particular location wearing specified clothing. *See, e.g., J.L.*, 529 U.S. at 268 (anonymous caller reported that a young black male wearing a plaid shirt and standing at a particular bus stop was carrying a gun).

The record before us does not fit neatly into the typical anonymous tip framework, as Firth made no effort to hide his identity and was known to Radenkovic. Despite this distinction, we may still borrow underlying principles from the anonymous tip context to evaluate the reliability of Firth's tip. *Cf. Robertson*, 305 F.3d at 169 (distinguishing "anonymous informant" case from "hot pursuit case, aided by a bystander's informative tip," but still applying standards of reliability from anonymous tip cases).

In the context of anonymous tips, the Supreme Court has made clear that "an informant's 'veracity,' 'reliability,' and

23

'basis of knowledge'. . . [are] 'highly relevant in determining the value of his report.'" *Alabama v. White*, 496 U.S. 325, 328 (1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 230 (1983)). When considering fully all the facts about a tip, the honesty of the caller, the reliability of his information and the basis of his knowledge are "closely intertwined issues that may usefully illuminate the commonsense, practical question" whether there is reasonable suspicion to support a *Terry* stop. *Gates*, 462 U.S. at 230; *see also White*, 496 U.S. at 328-29 (holding *Gates* analysis applicable to reasonable suspicion context); *Valentine*, 232 F.3d at 354 (Supreme Court "uses a flexible standard that assesses the relative value and reliability of an informant's tip in light of the totality of the circumstances").

The following specific aspects of tips indicate reliability:

(1)     The tip information was relayed from the informant to the officer in a face-to-face interaction such that the officer "had an opportunity to appraise the witness's credibility through observation." *Nelson*, 284 F.3d at 480; *see also Valentine*, 232 F.3d at 354.

(2)     The person providing the tip can be "held responsible if her allegations turn out to be fabricated." *Valentine*, 232 F.3d at 354 (internal quotations and citation omitted); *see also J.L.*, 529 U.S. at 270; *Adams v. Williams*, 407 U.S. 143, 146-47 (1972); *Nelson*, 284 F.3d at 482.

24

(3)    The content of the tip is not information that would be available to any observer. *Nelson*, 284 F.3d at 483 (citing *White*, 496 U.S. at 332 (1990)). A "not truly anonymous" tip is accorded greater weight when "the specific details of language, type of activity and location matched a pattern of criminal activity known to the police, but not to the general public," and "the tip could not have been generated by the general public, nor based solely on observation." *Id.* at 482, 484; s*ee also United States v. Roberson*, 90 F.3d 75, 79 (3d Cir. 1996) (affording tip less weight when information could have been gained by "caller . . . looking out of his window . . . at the time of his 911 call").

(4)    The person providing the information has recently witnessed the alleged criminal activity. *See Gates*, 462 U.S. at 234 (informant's "statement that the event was witnessed first-hand" entitles tip to greater weight); *Adams*, 407 U.S. at 147 (citing situation "when the victim of a street crime seeks immediate police aid and gives a description of his assailant" as example of tip that could support reasonable suspicion); *Nelson*, 284 F.3d at 482 (tip was more reliable when "posture of the caller allowed the officer to infer that the caller was himself a victim of the criminal activity").

(5)    The tip predicts what will follow, as this provides police the "means to test the informant's knowledge or

25

credibility." *J.L.*, 529 U.S. at 271; *see also White*, 496 U.S. at 332 ("When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop."); *Gates*, 462 U.S. at 245. Predictive information is also useful in that it "can reflect particularized knowledge." *Nelson*, 284 F.3d at 484.

With these indicators, "we assess whether the communication[] [J.L.originating from Firth] to the police possessed sufficient indicia of reliability, when considering the totality of the circumstances, for us to conclude that the officers possessed an objectively reasonable suspicion sufficient to justify a *Terry* stop." *Nelson*, 284 F.3d at 481. We conclude that this factor does not support reasonable suspicion to stop and frisk Brown.

It is true Firth did not make an anonymous call; the police would certainly have been able to find him and hold him accountable had his tip proved to be inaccurate. Moreover, nothing in the record suggests that Firth was dishonest. *See Wardlow*, 528 U.S. at 125 ("the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior"). Reasonable suspicion, however, requires that there must be some "reason to believe not only that the caller was honest but also that he was well informed." *White*, 496 U.S. at 332. With little information to

26

go on, Firth made inferences not based in fact. For example, he stated that Smith and Brown looked like the robbery suspects, but he had never seen the suspects and heard only a general description from Radenkovic.

Bad information in leads to bad information out. But how is a professional like Officer Pacheco to know this? First, a reasonable, trained officer would assume, from the context of the call, that Firth did not witness the attempted robbery; he had never seen the people he was attempting to identify. Second, a reasonable, trained officer would recognize that Firth's tip provided no information that would reflect any "particularized knowledge" or that he was "well-informed." Third, and most important, a reasonable, trained officer would realize Firth was merely providing information "that could be observed by anyone." *Nelson*, 284 F.3d at 483. Specifically, Firth was providing Officer Pacheco with nothing more than his observation that there were two black males at 22nd and Lombard Streets.

A tip is not reliable merely because "its description of the suspect's visible attributes prove accurate." *J.L.*, 529 U.S. at 271. "[R]easonable suspicion . . . requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id*. at 272; *see also White*, 496 U.S. at 332. Firth was undoubtedly sincere, but his tip was nothing more than Brown's "readily observable location and appearance," and was thus insufficient on its own to support reasonable suspicion.

27

*J.L.*, 529 U.S. at 272. "[O]ne citizen's subjective feelings are not enough to justify the seizure of another where the objective facts do not point to any articulable basis for suspicion." *Johnson*, 332 F.3d at 210. The tip in the record, sincere as Firth was, does not provide objective facts justifying the seizure of Brown and would not have established reasonable suspicion in the mind of a reasonable, trained officer.

3.      Officer Santiago's observations

With Firth's call imparting information a reasonably trained officer would suspect, was there anything observed personally by the police that would justify a stop of Brown? Put another way, "if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *White*, 496 U.S. at 330; *see also Nelson*, 284 F.3d at 480 ("If, for example, a tip on its own carries few indicia of reliability, much corroborating information is necessary to demonstrate reasonable suspicion."); *Roberson*, 90 F.3d at 80 ("omissions [in tip] probably would not have invalidated the stop, if, after corroborating readily observable facts, the police officers had noticed unusual or suspicious conduct on [the suspect's] part").

The following factors have been identified by the Supreme Court and our Court as suggesting suspicious behavior; alone they may be insufficient to establish reasonable suspicion,

28

but if observed by police they can serve to corroborate an otherwise insufficient tip.

(1)     Presence of a suspect in a high crime area.  *Wardlow*, 528 U.S. at 124; *Adams*, 407 U.S. at 147-48; *Johnson*, 332 F.3d at 206; *Nelson*, 284 F.3d at 483; *United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000); *Valentine*, 232 F.3d at 356; *Brown*, 159 F.3d at 149.

(2)     A suspect's presence on a street at a late hour.  *Adams*, 407 U.S. at 147-48; *Nelson*, 284 F.3d at 483; *Valentine*, 232 F.3d at 356; *Brown*, 159 F.3d at 148, 150.

(3)     A suspect's "nervous, evasive behavior," or flight from police.  *Wardlow*, 528 U.S. at 124*; see also United States v. Bonner*, 363 F.3d 213, 217 (3d Cir. 2004)*; Ubiles*, 224 F.3d at 217; *Valentine*, 232 F.3d at 357; *Brown*, 159 F.3d at 150.

(4)     A suspect behaves in a way that conforms to police officers' specialized knowledge of criminal activity. *Arvizu*, 534 U.S. at 276; *Nelson*, 284 F.3d at 482.

Notably, none of these factors was observed by Officer Santiago.  It was not alleged that Brown and Smith were in a high crime area.  Neither were they on the street late at night. Nothing about their behavior was evasive or suspicious.  Brown and Smith were walking normally; Santiago testified that they

were not running nor were they out of breath. *See Roberson*, 90 F.3d at 80 (stating that "walk[ing] casually" is "behavior that does not indicate criminal activity"). The two men were hailing a cab. While Officer Santiago thought this was "more to try to flee the area," he also agreed that the men "were flagging it down like an ordinary person would." Moreover, Brown and Smith were cooperative when approached by Santiago, who testified that he had a "nice, brief conversation" with the two men and that they were "cooperative" and "complied with all [his] demands."[9] In sum, as Officer Santiago testified, Brown and Smith "weren't doing anything suspicious other than hailing a taxicab."

Although legal, innocent behavior at times corroborates other information to raise reasonable suspicion, the suspects' act of hailing a cab in this case hardly corroborates the unreliable tip of Firth. *See, e.g., United States v. Sokolow*, 490 U.S. 1, 10 (1989) (in making a determination of reasonable suspicion, "'the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts'") (quoting

---

[9] We do not mean to suggest that had Brown not been cooperative, reasonable suspicion would have been established. "[T]he Supreme Court has 'consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.'" *Johnson*, 332 F.3d at 208 (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)).

*Gates*, 462 U.S. at 245 n.13). In light of the unreliability of the tip from Firth, some unquantifiable but significant amount of corroborating information is required to establish reasonable suspicion to stop Brown, and the record is devoid of that evidence.

\* \* \* \* \*

We conclude that Brown was seized before his aborted escape attempt, and each of the factors argued to support reasonable suspicion to stop and frisk him – the radio broadcast, the location tip, and Officer Santiago's observations of Brown and Smith – underwhelms. We recognize nonetheless that, under a totality of the circumstances test, even factors independently "susceptible to innocent explanation" can collectively amount to reasonable suspicion. *Arvizu*, 534 U.S. at 274, 275. We are confident, however, that in this case an excessively general description, combined with an honest but unreliable location tip in the absence of corroborating observations by the police, does not constitute reasonable suspicion under the "narrowly drawn authority" of *Terry v. Ohio*. 392 U.S. at 27. We thus reverse the District Court's denial of Brown's motion to suppress and vacate his conviction.

31