NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 09-4601
_____


UNITED STATES OF AMERICA



v.



FEVRIER ANDREW,
                                    Appellant



On Appeal from the District Court of the Virgin Islands
District Court No. 3-09-cr-00025-001
District Judge: The Honorable Curtis V. Gómez


Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
December 14, 2010

Before: McKEE, Chief Judge, FUENTES and SMITH, *Circuit Judges*

(Filed: March 15, 2011 )


_____

OPINION
_____



FUENTES, *Circuit Judge.*

Appellant Fevrier Andrew was charged with unlawful possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(5)(A) and 924(a)(2) (Count One) and unauthorized possession of a firearm, in violation of V.I. Code Ann. Tit. 14 § 2253(a) (Count Two).  Andrew filed a motion to suppress, which the District Court denied following an evidentiary hearing.  Thereafter, Andrew entered a conditional plea of guilty to Count One of the indictment pursuant to Federal Rule of Criminal Procedure 11(a)(2), preserving his right to appeal the denial of his motion to suppress.  Andrew was sentenced to a 12-month term of imprisonment, three years of supervised release, and a special assessment amounting to $100.  He appeals his conviction on Fourth Amendment grounds.  For the reasons below, we will affirm.[1]

## I.

Because we write for the parties, we discuss only the facts relevant to our conclusion.  Andrew was arrested during a law enforcement operation aimed at discovering persons illegally entering the United States ("Operation Virgin Sands 4").  The purpose of the operation was to establish check points and inspect the immigration status of passengers arriving on common carriers at the Red Hook ferry terminal located in St. Thomas, an area that is often used as an entry point by aliens arriving on ferries from St. John hoping to avoid inspection by immigration authorities.  On January 24, 2009, Officer Brin and Supervisor Grimes of the U.S. Customs and Border Protection ("CBP") were charged with patrolling the areas east and west of the ferry terminal.  This

---

[1] We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

area includes a "one lane dirt road, less than a quarter mile long, going around the perimeter of [a] lagoon" that CBP knows is routinely used by passengers who exit the ferries along the shore and meet cars driven along the dirt road. App. 36. Around 6:45 a.m. on January 24th, Brin and Grimes came across a blue Honda parked at the end of the dirt road, approximately fifty feet from the water. The officers, who were patrolling in a marked car, parked approximately twenty feet away from the Honda. Brin, who was wearing a uniform, observed Fevrier Andrew sitting in the blue vehicle. As Brin exited his car and approached the passenger's side of the car, he noted that Andrew "turned to [him] with a . . . little bit of a surprised look on his face." App. 40. The officer observed that Andrew appeared to be wet, was wearing only his underwear, and had his dry pants beside him.

Brin identified himself as a CBP officer and asked Andrew "How's it going" or "How are you doing today?" App. 41. Andrew responded that he was "okay." App. 42. Brin then asked Andrew what he was doing, and Andrew responded that he had heard that there was a stolen car in the area and had come to look around, since he had never been there before. Brin observed that Andrew had "an island accent" and "sounded like [he was] from Dominica, generally." App. 42. He then "decided to further ask [Andrew] about his status in the [United States]." App. 42. Brin testified that Andrew "jumped" and responded that he had been in the United States for 19 years. App. 43. Next, Brin asked Andrew for his name and date of birth and whether he had any documents permitting him to be in the United States. Andrew responded that he did not have those documents with him. Brin then explained to Andrew that he was going to verify his

immigration status in a computer database. The officer returned to his car and searched the database using Andrew's name and date of birth. The result of the search was negative, meaning that Brin found no information confirming that Andrew was legally present in the United States. Brin then called for assistance in order to conduct additional database inquiries. Sometime during this period, Andrew gave Supervisor Grimes his car registration and Virgin Islands driver's license. Using that information, Brin conducted another search of the same database, but again, the result was negative.

Thereafter, two other officers from CBP arrived, including Supervisor Neftali Acevedo. Neftali approached Andrew, who was still sitting in his vehicle, and identified himself as a Border Patrol officer. When he asked Andrew about his immigration status, Andrew responded that he was a citizen of Dominica and a lawful permanent resident in the United States. Acevedo returned to his car and ran Andrew's information through the central database to check whether Andrew was in fact a lawfully admitted permanent resident. Again, no records turned up. When Acevedo informed Andrew of the result, Andrew admitted that he was not legally present in the United States and that he was from Dominica. Acevedo asked Andrew to put his pants on and exit the vehicle. As Andrew was stepping out of the vehicle, Acevedo noticed a small transparent plastic "baggie" containing a leafy green substance located under the radio in front of the gear shift. After getting out of the car, Andrew was handcuffed and placed in Officer Brin's car, located twenty feet away.

Based on his observation of the leafy green substance, Acevedo requested a canine unit to conduct a search of the car. The canine unit arrived approximately five minutes

4

later.  While examining the car, the dog was alerted to the presence of contraband.  As a result, three of the officers conducted a search of the car.  They then discovered a firearm, a ten-round magazine, a small knife, and a bullet under the driver's side floor mat.

At the suppression hearing held in the District Court, the court concluded that, under the totality of the circumstances, "there was certainly some articulable suspicion that led to the officers' inquiry in the first instance.  That inquiry gave rise to probable cause for the defendant's subsequent arrest, and the search that was incident to the arrest was appropriate under the circumstances."  App. 89.

## II.

On appeal Andrew argues that (1) the officers lacked reasonable suspicion to conduct an investigative stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968) and (2) the search of his car was an unlawful search incident to arrest under *Arizona v. Gant*, 129 S.Ct. 1710 (2009).  We review the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercise plenary review of the District Court's application of the law to those facts.  *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).  We may affirm on any ground supported by the record.  *United States v. Veal*, 453 F.3d 164, 167 (3d Cir. 2006).

Under *Terry*, an officer may conduct "a brief, investigatory stop" of an individual "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  The analysis is two-fold.  First, "[w]e begin by determining when the seizure of [Andrew] occurred, as that is the moment the Fourth Amendment becomes relevant."  *United States v. Brown*, 448 F.3d 239, 245 (3d

5

Cir. 2006). Next, "we evaluate the presence or absence of reasonable suspicion." *Id.* "Reasonable suspicion . . . demands that the detaining officers . . . have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* at 246 (internal quotations and citations omitted). In determining whether there was reasonable suspicion, we consider the totality of the circumstances, *id.*, and what the "officers knew before they conducted their search," *Florida v. J.L.*, 529 U.S. 266 (2000).

Andrew submits that he was "seized" within the Fourth Amendment when Officer Brin began questioning Andrew about his immigration status and requested his immigration documents. We agree. We next consider whether, under the totality of the circumstances, Officer Brin had a "particularized and objective basis" for believing that Andrew was involved in criminal activity. We agree with the District Court that the CBP officers had "articulable suspicion" to detain Andrew. Andrew was discovered in an area known to be used by persons arriving from St. John wishing to avoid immigration inspection. Brin, who has worked for the CBP since 2002 and participated in a number of immigration operations, testified that the specific dirt road where Andrew was discovered was used by persons "trying to get away from our [Virgin Sands] operation." App. 36. He explained that persons attempting to enter the island illegally "get off the barge and turn right along the rocky shoreline[, and then] run along the front of the shoreline and turn up around the lagoon, onto that dirt road." App. 36. Brin also testified that in "just about every operation" persons arriving illegally at the ferry dock "had a car on the end of the dirt road." App. 49. We give significant weight to Brin's observations and experience. *See, e.g.*, *Brown*, 448 F.3d at 247 ("[W]e must allow 'officers to draw on

6

their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'") (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). While Brin also testified that in the past he had only observed multiple persons working "in little groups" and "carpool[ing] together", that testimony does not undercut the possibility that Andrew was participating in a scheme intended to avoid immigration check points. App. 49.

Several other factors collectively serve together to create reasonable suspicion. First, Brin noted that Andrew "looked surprised" when approached by Brin, and "immediately jumped" when asked about his immigration status in the United States. App. 40, 43. Similar behavior can provide a basis for reasonable suspicion. *See, e.g.*, *Wardlow*, 528 U.S. at 124. Second, when Brin asked Andrew what he was doing in the area, Andrew responded that "he had heard that there was a stolen vehicle or car in that area. And he had never been in that area before, so he came to take a look around." App. 42. We find it significant, given the location of Andrew's vehicle, that his appearance was inconsistent with his stated reason for being in the area. Finally, Brin, an experienced immigration officer, testified that he recognized Andrew's accent as being an "island" accent from "Dominica." App. 42. Ultimately, although these factors present a close call, considering the totality of the circumstances and Officer Brin's experience and observations, we conclude they amount to reasonable suspicion.

Andrew's second argument on appeal is that the search of his car was illegal under *Arizona v. Gant*, 129 S.Ct. 1710 (2009). In *Gant*, the Supreme Court "narrowed the scope of the search-incident-to-arrest doctrine." *United States v. Shakir*, 616 F.3d 315,

318 (3d Cir. 2010). *Gant* held that a search of a car incident to arrest is permitted only in two situations: (1) when "it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle" or (2) "the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." 129 S.Ct. at 1719. Andrew argues that the search of his vehicle was unconstitutional under *Gant* because, first, it was not reasonable to believe that evidence of an immigration violation might be found in the vehicle and second, he posed no threat to the evidence or the officers, given that he was handcuffed in the back of a marked car located twenty feet away from his car.

However, *Gant* does not control in this case because the officers did not need to rely on the search incident to arrest doctrine. Even after *Gant*, "[o]ther established exceptions to the warrant requirement authorize a vehicle search under additional circumstances when safety or evidentiary concerns demand." *Id.* at 1721. The *Gant* Court explicitly stated that "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity, [*United States v. Ross,* 456 U.S. 798, 820-21 (1982)], authorizes a search of any area of the vehicle in which the evidence might be found." *Id.* In other words, the automobile exception to the warrant requirement, which "permits law enforcement to seize and search an automobile without a warrant if probable cause exists to believe it contains contraband," *United States v. Burton,* 288 F.3d 91, 100 (3d Cir. 2002), has continued vitality and applies here.

In this case, the search of Andrew's car is constitutional under the automobile exception. As Andrew was exiting his car, one of the officers observed a plastic bag in the car containing a leafy green substance. Upon viewing the plastic bag containing that

8

substance, the officer had probable cause to search for marijuana. *See United States v. Williams*, 413 F.3d 347, 353 (3d Cir. 2005). If there is probable cause that a vehicle contains evidence of a crime, *Ross* continues to authorize "searches for evidence relevant to offenses other than the offense of arrest and the scope of the search authorized is broader." *Gant*, 129 S.Ct. at 1721. Thus, the search of Andrew's vehicle was constitutional.

## III. CONCLUSION

The District Court properly denied Andrew's motion to suppress. Thus, his conviction will be affirmed.