**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 19-2925

_____

UNITED STATES OF AMERICA

v.

CARLOS RAMOS,
a/k/a CARMELO ROMAN,

Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:18-cr-00435-001)
District Judge: Honorable Paul S. Diamond

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
on July 7, 2020

Before: MCKEE, BIBAS, and FUENTES, *Circuit Judges*

(Filed:  September 8, 2020)

_____

OPINION*

_____

BIBAS, *Circuit Judge*.

Be careful what you ship; postal inspectors are watching. After receiving a shipment of

drugs, Carlos Ramos was convicted at trial of possessing cocaine with intent to distribute

_____

* This disposition is not an opinion of the full Court and, under I.O.P. 5.7, is not binding
precedent.

it. We hold that the postal inspector who found the package had reasonable suspicion to hold it for a dog sniff. Prosecutors properly referred to Ramos's failure, after he waived his *Miranda* rights, to deny his involvement. And his long sentence was proper given his extensive (though low-level and nonviolent) criminal record. But the District Court may have based Ramos's supervised-release term on a misunderstanding about the mandatory minimum. So we will vacate that part of his sentence, but affirm the rest of it, as well as his conviction.

## I. BACKGROUND

In late 2018, a postal inspector noticed a suspicious package addressed to "Carmelo Roman." So he held it for a dog sniff. When the dog detected drugs, the inspector got a warrant, opened it, and found a kilogram of cocaine.

The inspector and his colleagues devised a plan to nab Carmelo. They created a decoy package. An undercover inspector delivered the package to the address listed on it. A man claimed to be Carmelo and accepted it. After he opened it up, the inspectors arrested him. "Carmelo" was really Ramos. The inspectors questioned him and he made statements about the package delivery and his use of drugs. The Government charged him with possessing drugs with intent to distribute them and doing so within a thousand feet of a school.

Before trial, Ramos moved to exclude all the evidence. He claimed that the inspectors lacked reasonable suspicion to justify diverting his package for the dog sniff. Thus, he argued, they had violated the Fourth Amendment. And because all the Government's evidence was the fruit of that seizure, he argued, it all had to be suppressed. But the court disagreed, finding that there was reasonable suspicion. So Ramos went to trial.

2

At trial, the Government's evidence showed that Ramos got the package of cocaine, planned to resell it, and (when questioned) did not deny being a drug dealer. The jury convicted him on all counts. The court sentenced him to thirty years' imprisonment followed by twelve years' supervised release.

## II. THE GOVERNMENT REASONABLY DETAINED THE PACKAGE FOR A DOG SNIFF

Ramos first challenges the denial of his motion to suppress. He challenges only the District Court's legal conclusion, so we review de novo. *United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006). Because the inspector had reasonable suspicion, the District Court properly admitted the evidence.

### A. Postal inspectors may detain packages when they reasonably suspect criminal activity

"Postal authorities may seize and detain mailed items for a reasonable amount of time, if they have a reasonable suspicion of criminal activity." *United States v. Golson*, 743 F.3d 44, 55 (3d Cir. 2014). Reasonable suspicion is a very low bar. It requires more than a "mere hunch," but not much more. *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (internal quotation marks omitted). For an investigator's suspicion to be reasonable, he needs only "a particularized and objective basis for suspecting legal wrongdoing." *Id.* at 273 (internal quotation marks omitted). That basis may "fall[] considerably short of satisfying a preponderance of the evidence standard." *Id.* at 274.

### B. The inspector had reasonable suspicion

The inspector acted reasonably. Five signs aroused his suspicion: First, the package was from Puerto Rico, a common source of illegal cocaine shipments. Second, the package was

3

sent by Priority Mail, a common way to ship drugs. Third, according to the databases used by the Postal Service, the sender and addressee listed on the package matched no one living at their purported addresses. Fourth, the package was mailed from a zip code different from the one on its return address. And fifth, three other Priority Mail packages had been sent from Puerto Rico to that address.

Each of these facts (except perhaps the third) would be too generic to support a reasonable suspicion on its own. But we cannot evaluate these four facts "in isolation." *Arvizu*, 534 U.S. at 274. A "series of acts[, each] perhaps innocent in itself, [can], taken together, … warrant[] further investigation." *Id.*

Taken together, these facts justified the inspector's suspicion. We said as much in *Golson*, when a postal inspector had detained a package for very similar reasons. 743 F.3d at 55 n.10. True, the parties there did not dispute the point. *Id.* And the facts there were slightly different; in *Golson*, the return address was fake, while here only the names were likely fake. *Id.* But we see no appreciable difference in how "particularized and objective [the] basis" is for the suspicion. *Arvizu*, 534 U.S. at 273 (internal quotation marks omitted). Because the inspector's suspicion was reasonable, the District Court correctly admitted the evidence.

## II. THE GOVERNMENT DID NOT COMMENT ON RAMOS'S POST-ARREST SILENCE

Next, Ramos claims that prosecutors should not have mentioned at trial that after his arrest, he remained silent. That is not what happened. After his arrest, he agreed to speak, and the Government commented only on what he said.

We review such claims de novo, except that because Ramos never objected to this at trial, we review here only for plain error. *United States v. Shannon*, 766 F.3d 346, 355 n.12 (3d Cir. 2014). But there was no error, let alone plain error.

**A. Ramos agreed to be questioned**

When the inspectors arrested Ramos, they warned him of his right to remain silent. *See Miranda v. Arizona*, 384 U.S. 436 (1966). But he validly waived that right and at first agreed to answer questions. (Ramos does not dispute that his waiver was valid.) The inspector asked him if he knew why he was being questioned, and Ramos nodded "yes." App. 255. When the inspector asked whether he was the "only one involved with receiving cocaine from Puerto Rico," Ramos gestured toward his co-tenants. But when the inspector asked Ramos to say more about them, Ramos declined, saying: "How do I know you'll take care of me[?]" App. 285. Soon, Ramos thought better of speaking with the police, so he ended the interview.

**B. The government's comments about his questioning were constitutional**

At trial, the government discussed the questioning. His answers were suspicious, it argued, because when Ramos implicated his co-tenants, he never denied his own guilt. Ramos did not object at trial. But now he claims that, by mentioning his omission, the government wrongly penalized him for invoking his right to remain silent. Not so.

To be sure, Ramos had the right to remain silent. U.S. Const. amend. V; *Miranda*, 384 U.S. at 467–68. And once he exercised that right, the Government could not cite his silence as evidence of guilt. *Doyle v. Ohio*, 426 U.S. 610, 619 (1976). But that is not what

5

happened. Ramos *waived* his right to remain silent. The Government's theory was that when he *did* speak, his answers were suspiciously incomplete, not denying guilt.

Prosecutors may make that argument. "[A] defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *Anderson v. Charles*, 447 U.S. 404, 408 (1980). So mentioning that a defendant "omit[ted] facts" is not punishing him for staying silent. *Id.* at 409. Thus, prosecutors may comment on "the substance and limited nature of what [a defendant] *did* say." *Rolan v. Coleman*, 680 F.3d 311, 326 (3d Cir. 2012) (emphasis added).

That is all the Government did. Its theory was that when the inspector asked if Ramos was "the only one involved in this cocaine trafficking operation," "[h]e didn't deny being a part of the operation." App. 390 (government's closing statement); *accord* App. 289 (redirect examination of inspector). Because the Government commented on his statement, not his silence, its comments were proper.

### III. RAMOS'S SENTENCE IS REASONABLE

Ramos also challenges the length of his prison sentence as substantively unreasonable. The Federal Sentencing Guidelines would ordinarily recommend a sentence of ten to twelve-and-a-half years. But because Ramos had eight prior felony convictions for small-scale drug dealing, the Guidelines classified him as a career offender. That jacked his sentencing range up to thirty years to life.

The District Court agreed with the Guidelines' recommendation. It found that Ramos needed a hefty sentence to deter him from committing more crimes. It added that a long

6

sentence would also deter others from selling drugs, especially near a school. So it sentenced him to thirty years' imprisonment. That was proper.

## A. Sentencing courts enjoy enormous discretion

We review the substantive reasonableness of a sentence for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 45–46 (2007). Ramos must show that "no reasonable sentencing court would have imposed [his] sentence." *United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009). There is a "broad range of possible sentences that can be considered reasonable in light of the [18 U.S.C.] § 3553(a) factors." *United States v. Wise*, 515 F.3d 207, 218 (3d Cir. 2008). So Ramos bears a heavy burden of proof.

## B. The sentencing court did not abuse its discretion

Ramos has not met his burden. He challenges the District Court's decision to follow the Sentencing Guidelines and to find a thirty-year sentence necessary for deterrence. But both conclusions were reasonable.

*1. The court reasonably followed the Sentencing Guidelines*. Ramos argues that even though the career-offender enhancement applies, the District Court should have rejected it because it was not designed for small-time criminals like him. He points out that he is no drug kingpin and has no violent convictions. And he notes that the Sentencing Commission has recommended that Congress remove felons like him from its scope.

But what Ramos's criminal history lacks in severity, it makes up for in quantity. Though he needed only two prior felony drug convictions to trigger the enhancement, he had eight. And other factors made it worse: Ramos once escaped from a drug-rehab facility to which he had been sentenced. Four times, courts had to issue bench warrants because he failed to

7

appear. And he committed many of his crimes while on probation for other crimes. Given his copious criminal record, the court reasonably treated him as a career offender.

*2. The district judge reasonably concluded that Ramos needed a long sentence to deter him, as well as others.* Ramos also argues that because his prior sentences were each under two years, we cannot rule out that a ten- to twelve-year sentence would have sufficed to deter him. But no sentencing rule requires judges to escalate penalties gradually until one sticks. Sometimes, severe sentences are apt even for defendants with no criminal history. And Ramos's record was extensive. Given his repeated flouting of the law and his repeated failures to learn his lesson, a judge could reasonably find that he needed a long sentence to deter him, as well as others.

## IV.  THE DISTRICT COURT SHOULD RECONSIDER THE LENGTH OF RAMOS'S SUPERVISED RELEASE

Finally, Ramos appeals the length of his supervised-release sentence. The District Court sentenced him to twelve years. He chose that length, it seems, because he thought that was the mandatory-minimum term. The probation officer said so, and neither party objected.

But that was wrong. Ramos and the Government now agree that his supervised release may last as few as six years. 21 U.S.C. § 841(b)(1)(C). We cannot be sure the District Court did not rely on that error. Ramos and the Government agree that we should give the court a second crack at setting the supervised-release term. So we will vacate that portion of the sentence and remand it for resentencing.

8

* * * * *

Ramos's supervised-release term may have been tainted by the District Court's possible misunderstanding of the mandatory-minimum term. We will thus vacate that portion of the sentence but affirm everything else.